84 F.3d 834
 64 USLW 2725
 AMERICAN DEPOSIT CORPORATION and Blackfeet National Bank,
Plaintiffs-Appellants,
v.
James W. SCHACHT, individually and as Acting Director of
Insurance of the State of Illinois, Defendant-Appellee.
 No. 95-2462.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 12, 1996.
Decided May 13, 1996.
 
 George L. Saunders, Jr., Thomas F. Bush, Jr., Saunders & Monroe, Chicago, IL, Thaddeus Holt (argued), Dennis M. Gingold, Anderson Aukamp & Gingold, Washington, DC, for Plaintiffs-Appellants.
 Daniel I. Schlessinger, Robert A. Knuti, Damon N. Vocke, Lord, Bissell & Brook, Chicago, IL, Cacilia R. Masover (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant-Appellee.
 Robert A. Kunti, Lord, Bissell & Brook, Chicago, IL, David Overlock Stewart, Martin E. Lybecker, Ropes & Gray, Washington, DC, for American Council of Life Insurance, Amicus Curiae.
 Carl S. Nadler, Jenner & Block, Chicago, IL, Ann M. Kappler, Scott A. Sinder, Jenner & Block, Washington, DC, for National Association of Life Underwriters, Amicus Curiae.
 Before CUMMINGS, FLAUM and DIANE P. WOOD, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The National Bank Act ("Bank Act") arguably permits a national bank to sell an innovative investment product known as the "Retirement CD." The Illinois Insurance Code ("Insurance Code"), however, prohibits selling this product without a certificate of authority from the Director of Insurance. Defendant Blackfeet National Bank ("Blackfeet") has no such certificate and sued for a declaration that the Illinois Insurance Code cannot stand in the face of the National Bank Act. The district court concluded that the sale of the Retirement CD was the "business of insurance" within the meaning of the McCarran-Ferguson Act, which reverses the rule of federal preemption, and thus held that the Illinois Insurance Code applied regardless of whether the sale of the Retirement CD was authorized by the National Bank Act. For the following reasons, we affirm that decision.
 
 I.
 
 2
 The following facts are undisputed. Plaintiff American Deposit Corporation, of Pine, Colorado ("ADC") owns and licenses to banks an investment vehicle known as the Retirement CD. The Retirement CD is structured such that the purchaser qualifies for special tax treatment by the Internal Revenue Service. A customer first deposits money with an individual bank and selects a maturity date in the future (usually the customer's anticipated retirement date). Interest then accumulates on the deposits until the maturity date, at which time the depositor may withdraw in a lump sum up to two-thirds of the account balance, including the accrued interest. Thereafter, the customer receives the remainder of the account in periodic payments for the rest of his life--essentially a lifetime annuity. The amount of each payment is determined according to mortality tables and a guaranteed interest rate. The customer is assured of receiving the entire amount of the account balance regardless of his lifespan; if he dies prior to receiving that amount in monthly payments, the remainder of the account is paid in a lump sum to his estate or designated beneficiary.
 
 
 3
 Blackfeet is a small national bank located on the Blackfeet Indian Reservation in Browning, Montana and is a licensee of the Retirement CD. By late 1994, Blackfeet was offering the Retirement CD to investors across the country, although it had yet to accept a deposit from an Illinois resident. Defendant Schacht, on behalf of the State of Illinois, issued an order on December 9, 1994, directing Blackfeet to "immediately cease and desist any and all practices which purport to offer [the Retirement CD] to residents of the State of Illinois." The basis for the order was that Blackfeet was engaging in the business of insurance without a certificate of authority to do so in violation of 215 ILCS 5/24. Plaintiffs concede that because of its lifetime monthly payments feature, the Retirement CD is essentially an annuity and that the Insurance Code includes "granting, purchasing or disposing of annuities" within the "life insurance" classification of the business of insurance. 215 ILCS 5/4(a). Section 5/24 of the Insurance Code dictates that "[n]o company shall transact any business of insurance until it has received a certificate of authority" from the Director of Insurance, which plaintiffs concede they do not have.
 
 
 4
 The Director of Insurance issues certificates of authority only to domestic, foreign, or alien companies. "Domestic companies" are those organized under the laws of the State of Illinois, 215 ILCS 5/2(f), "foreign companies" are those organized under the laws of any other state or territory of the United States, or the District of Columbia, 215 ILCS 5/2(g), and "alien companies" are those organized under the laws of a country other than the United States, 215 ILCS 5/2(h). Because Blackfeet is a national bank organized under the Bank Act, it does not qualify for certification as any of the above.[1] Additionally, 215 ILCS 5/111(c) dictates that companies which engage in other business in addition to the life insurance business--which, as a bank, Blackfeet obviously does--may not be certified. Therefore, Blackfeet is not permitted under the Insurance Code to sell and underwrite the Retirement CD in Illinois. The only way it could accomplish the sale in compliance with the Insurance Code would be to set up a subsidiary specifically for that purpose, which could then be issued a certificate of authority.
 
 
 5
 Blackfeet brought suit against Schacht for a declaration that the sale of the Retirement CD is not subject to regulation by the State of Illinois. Blackfeet argues that the Bank Act, through the express authority to receive deposits, 12 U.S.C. § 24 (Seventh), and to enter into contracts, 12 U.S.C. § 24 (Third), authorizes the sale of the Retirement CD. We will assume, arguendo, that it does.[2] Magistrate Judge Bobrick granted summary judgement to Schacht, concluding that "the nature of the Retirement CD makes it an appropriate subject for regulation as an insurance product because it entails an insurance or mortality risk and a guaranteed return."
 
 II.
 
 6
 We review the grant of a motion for summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir.1995).
 
 
 7
 The tension in this case comes from an apparent overlap between activities arguably authorized by the Bank Act and activities that individual states have a legitimate interest in regulating. If we assume that Blackfeet is authorized to sell the Retirement CD under the Bank Act, the pertinent question is whether the Insurance Code can nonetheless prohibit the sale. It is well settled that a federal law preempts a conflicting state law under the Supremacy Clause of Article VI of the Constitution, and the Bank Act is no exception. See, e.g., Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (holding that a provision of the Bank Act which allows national banks located in towns with populations of fewer than 5000 people to act as insurance agents preempts contrary state law); Franklin Nat'l Bank v. New York, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (striking down an effort to apply state Saturday closing laws to national banks); Easton v. Iowa, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (striking down state regulation of the circumstances in which a national bank can accept deposits). Thus under ordinary preemption rules, the provisions of the Bank Act would trump contrary Illinois law.
 
 
 8
 However, with regard to the "business of insurance," the McCarran-Ferguson Act "overturn[ed] the normal legal rules of preemption" by imposing a rule "that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless the federal statute specifically provides otherwise." U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 507, 113 S.Ct. 2202, 2211, 124 L.Ed.2d 449. Specifically, Section 1012 of the McCarran-Ferguson Act provides:
 
 
 9
 (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 
 
 10
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance....
 
 
 11
 Thus to decide whether the Insurance Code may stand in the face of the Bank Act we must resolve three issues: (1) whether the pertinent sections of the Insurance Code were enacted "for the purpose of regulating the business of insurance"; (2) whether the Retirement CD is properly considered "the business of insurance"; and (3) whether the pertinent provisions of the Bank Act "specifically relate to the business of insurance." Id.
 
 A.
 
 12
 In SEC v. National Sec., Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668, the Court held that "statutes aimed at protecting or regulating th[e] relationship [between insurer and insured], directly or indirectly, are laws regulating the 'business of insurance.' " Id. at 460, 89 S.Ct. at 569. The opinion emphasized that the focus of the McCarran-Ferguson Act is upon the relationship between insurance companies and their customers:
 
 
 13
 The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement--these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was--it was on the relationship between the insurance company and the policyholder. Id.
 
 
 14
 The Court stated that the "broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Id. (citing Black's Law Dictionary 1236, 1286 (6th ed. 1990)). Section 5/24 of the Insurance Code prohibits companies from selling any type of insurance without gaining prior approval of the Department of Insurance. The approval requirement is necessary for the State of Illinois to monitor and regulate the relationship between insurer and insured; without it, regulations that more directly concern the actual relationship between insurer and insured would be impossible to enforce. Furthermore, 215 ILCS 5/121-1 expressly states that the Illinois General Assembly enacted the certification requirement because it was "concerned with protection of residents of [Illinois] against acts by insurers not authorized to do an insurance business in [Illinois]." We conclude that Section 5/24 possesses the " 'end, intention, and aim' of adjusting, managing, or controlling the business of insurance," and was therefore enacted "for the purposes of regulating the business of insurance." Id. Thus the first prong of the test is satisfied.
 
 B.
 
 15
 Having concluded that Section 5/24 was "enacted for the purpose of regulating the business of insurance," we must determine whether the sale of the Retirement CD is properly considered the "business of insurance." Section 5/4(a) expressly includes annuities in its definition of "life insurance," but we may not simply defer to that definition. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 69, 79 S.Ct. 618, 620, 3 L.Ed.2d 640 ("The meaning of 'insurance' ... under the [McCarran-Ferguson Act] is a federal question."). Thus we must go further and examine whether the specific practice to which the Code would be applied--the sale of the Retirement CD--is properly considered the "business of insurance." See Fabe, 508 U.S. at 508, 113 S.Ct. at 2212 (noting that an Ohio priority statute was the "business of insurance" to the extent that it regulated policyholders, but not to the extent that it furthered the interests of other creditors); Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc., 50 F.3d 1486, 1489 (9th Cir.1995) ("The proper inquiry is whether ... the specific practice being challenged under federal law is a part of the 'business of insurance.' ").
 
 
 16
 Plaintiffs initially cite NationsBank of N.C. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740, in claiming that the Supreme Court has already held that the Retirement CD, as an annuity, is not the "business of insurance." We think plaintiffs read too much into that case. In NationsBank, the Comptroller of the Currency had authorized a national bank to broker annuities as "an incidental powe[r] ... necessary to carry on the business of banking." Id. at ----, 115 S.Ct. at 814. In addition, the Comptroller had concluded that annuities were not "insurance" within the meaning of 15 U.S.C. § 92, which allows national banks doing business in towns of 5000 people or less to act as an agent for an insurance company. The Court held that the Comptroller's interpretations of the Bank Act were reasonable and thus were given controlling weight. Id. However, NationsBank is distinguishable from our situation. First, the holding was limited to the brokering, not underwriting, of annuities. Id. at ---- n. 4, 115 S.Ct. at 815 n. 4 ("Assuring that the brokerage in question would not deviate from traditional bank practices, the Comptroller specified that NationsBank 'will act only as agent, ... will not have a principal stake in annuity contracts and therefore will incur no interest rate or actuarial risks.' "). Second, the holding was limited to whether federal law precluded a national bank from brokering annuities, not whether a bank doing so--much less a bank underwriting annuities--would be subject to state regulation.[3] In fact, the Supreme Court expressly noted that "States generally classify annuities as insurance when defining the powers of ... state insurance regulators." Id. at ----, 115 S.Ct. at 815. Thus, NationsBank did not answer the question as plaintiffs suggest.
 
 
 17
 However, the Supreme Court has spoken on this issue and articulated a tripartite standard in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647, and Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261, to determine what constitutes the "business of insurance" for purposes of Section 1012(b) of the McCarran-Ferguson Act. Those criteria are: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. Pireno, 458 U.S. at 129, 102 S.Ct. at 3008.
 
 
 18
 We are aware that the Supreme Court, in distinguishing the state law at issue in U.S. Dep't of Treasury v. Fabe from those at issue in Royal Drug and Pireno, recently noted that those cases involved determinations of whether certain activities were the "business of insurance" for purposes of the second clause of Section 1012(b), which exempts the "business of insurance" from antitrust laws, not determinations of whether laws were "enacted for the purposes of regulating the business of insurance" for purposes of the first clause of Section 1012(b):
 
 
 19
 Both Royal Drug and Pireno, moreover, involved the scope of the antitrust immunity located in the second clause of § 2(b). We deal here with the first clause, which is not so narrowly circumscribed. The language of § 2(b) is unambiguous: the first clause commits laws "enacted ... for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from antitrust laws. To equate laws "enacted ... for the purpose of regulating the business of insurance" with "the business of insurance" itself, as petitioner urges us to do, would be to read words out of the statute. This we refuse to do. Fabe, 508 U.S. at 504, 113 S.Ct. at 2209-2210.
 
 
 20
 However, we do not interpret this language to mean that it is inappropriate to utilize the criteria announced in Royal Drug and Pireno in cases involving the first clause of Section 1012(b). Rather, the Court merely noted that one cannot answer the question of whether a state law was "enacted for the purposes of regulating the business of insurance" merely by reference to the Royal Drug and Pireno criteria. As the Sixth Circuit recently recognized,
 
 
 21
 If ... the issue arises of whether a particular activity is part of the "business of insurance," the Pireno criteria apply. See Fabe, 508 U.S. at 500, 113 S.Ct. at 2208 (noting, in considering claim that arose under first clause of § 1012(b), that Pireno "identified the three criteria ... that are relevant in determining what activities constitute the 'business of insurance.' ") (emphasis added). In short, the Fabe Court merely noted that the scope of the respective immunities created by the first and second clauses of § 1012(b) are different; it assuredly did not give "business of insurance" one meaning in the first clause and a different meaning in the second. Owensboro Nat. Bank v. Stephens, 44 F.3d 388 (6th Cir.1994), certiorari denied, 517 U.S. 1119, 116 S.Ct. 1350, 134 L.Ed.2d 519.
 
 
 22
 Because the situation facing us involves a determination of whether the sale of the Retirement CD is to be included within the "business of insurance," we shall apply the criteria announced in Royal Drug and Pireno.
 
 
 23
 The first and most important factor in determining whether a practice is the "business of insurance" is whether it spreads policyholder risk. The spreading and underwriting of a policyholder's risk are "indispensable characteristic[s] of insurance," Pireno, 458 U.S. at 127, 102 S.Ct. at 3008; Royal Drug, 440 U.S. at 212, 99 S.Ct. at 1073, and the legislative history of the McCarran-Ferguson Act "strongly suggest[s] that Congress understood the business of insurance to be the underwriting and spreading of risk." Royal Drug, 440 U.S. at 221, 99 S.Ct. at 1078; H.R.Rep. No. 873, 78th Cong., 1st Sess., 8-9 (1943) ("Insurance is the distribution of risk according to hazard, experience, and the law of averages."). Essentially, lifetime annuities such as the Retirement CD are the "mirror image" of life insurance policies.[4] With life insurance, the issuing company gambles that the purchaser of the policy will not pass away sooner than predicted such that the company does not receive enough in premiums and interest to cover the policy's payout obligation; with lifetime annuities, the position is reversed and the company gambles that the annuitant will not survive longer than predicted such that the company will have to pay more than the amount invested by the annuitant (plus interest). The element of mortality risk, however, is the same in both:
 
 
 24
 Each issuer [of an annuity] assumes the risk of mortality from the moment the contract is issued. That risk is an actuarial prognostication that a certain number of annuitants will survive to specific ages. Even if a substantial number live beyond their predicted demise, the company issuing the annuity--whether it be fixed or variable--is obligated to make the annuity payments on the basis of the mortality prediction reflected in the contract. This is the mortality risk assumed [by the issuer]. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 70, 79 S.Ct. 618, 621, 3 L.Ed.2d 640.
 
 
 25
 See also Associates In Adolescent Psychiatry v. Home Life, 941 F.2d 561, 565 (7th Cir.1991) ("Annuities sometimes contain an element of insurance: they may, for example, promise a monthly payment from retirement until death ... [t]he seller then bears both investment and insurance risks."). That typical life insurance involves payment "upon" a death, while lifetime annuities involve payment "until" a death is a distinction without a difference: a company selling either the typical insurance policy or the lifetime annuity uses exactly the same actuarial tables to calculate its mortality risk and to set the price of its product.
 
 
 26
 Not all annuities have insurance characteristics, however. The Supreme Court has noted that " 'insurance' involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts," Variable Annuity Life Ins. Co., 359 U.S. at 71, 79 S.Ct. at 622, and thus has held that variable annuities are not "insurance" for purposes of the Securities Act of 1933. Id. at 71-73, 79 S.Ct. at 621-23. The Retirement CD is not a variable annuity. It offers a guaranteed payment to the annuitant for the rest of his life in a predetermined amount and also provides a guaranteed return of the total balance. Thus it involves both fundamental characteristics of insurance: a mortality risk and a guaranteed return. Id. at 71, 79 S.Ct. at 621.
 
 
 27
 Plaintiffs argue that the Retirement CD does not satisfy the first criterion--spreading risk--by emphasizing that the spreading and the underwriting of risk refer to "the transfer of risk characteristic of insurance." Pireno, 458 U.S. at 130, 102 S.Ct. at 3009 (emphasis added). They contend that "risk characteristic of insurance" is "risk of loss resulting from the happening of a contingent event, such as the loss of a house by fire ... or of a breadwinner by death." [Pl. Br. 24]. The Retirement CD, they argue, does not spread this type of risk, but spreads only an "investment risk," which they define as "the hazard of having insufficient investment acumen to outlive an asset." Id.
 
 
 28
 We are unpersuaded by plaintiffs' argument. First, describing the purchase of the Retirement CD as "hedging against faulty investment acumen," [Pl. Br. 18], does little to distinguish it from typical insurance; purchasing fire insurance can just as easily be described as "hedging against faulty fire prevention acumen." [Brief of Amicus Curiae American Council of Life Insurance p. 6]. Second, the purpose of purchasing a life insurance policy on a family's breadwinner and of purchasing a lifetime annuity is essentially the same. The individual who purchases the life insurance policy insures against no longer having the money produced by the breadwinner, and the person who purchases a lifetime annuity insures against no longer having sufficient money produced by his assets. Finally, plaintiffs' attempt to distinguish insurance by claiming that it involves a loss caused by a single, contingent event overlooks an important aspect of the Retirement CD: By providing a guaranteed minimum return on investment, the Retirement CD insures the purchaser against a decline in the market--a single, contingent event. The purchaser is given the comfort that should a depression occur in the market, causing rates of interest to fall significantly, he will not suffer a "loss" of future income, but will continue to receive the rate of interest guaranteed in his Retirement CD contract. Furthermore, insurance policies do not always insure against circumstances that occur as a sudden event. For example, one is currently able to purchase an insurance policy that will provide nursing home care to an individual when he finally reaches an age where he is no longer able to care for himself. In short, we conclude that the Retirement CD spreads policyholder risk in a manner similar to typical insurance and thus satisfies the first criterion of the Pireno test.
 
 
 29
 The Retirement CD satisfies the second and third Pireno factors as well. It is not only an "integral part" of the policy relationship between the insurer and the insured, it is the very document that evidences that relationship. It dictates the rights and obligations of both parties and sets forth the amount of deposit, date of first withdrawal, rate of interest, and the guaranteed amount of monthly payments. The third factor is met because the Retirement CD is an annuity, virtually all of which are issued by insurance companies. See Barron's, Oct. 3, 1994, at 23 (noting that nearly all of the $1 trillion worth of annuities currently in effect in the United States are issued by regulated insurance companies). Furthermore, forty-two state legislatures currently consider annuities to be an insurance industry activity and regulate them as such. [Brief of Amicus Curiae Council of Life Insurance, Ex. D (listing statutes) ]; see also SEC v. Variable Annuity Co., 359 U.S. at 69, 79 S.Ct. at 621 ("All states regulate 'annuities' under 'insurance' laws."). They do so because a state's interests in regulating the sale of annuities are virtually identical to its interests in regulating the sale of typical insurance. States attempt to ensure that companies remain sufficiently solvent to meet their obligations to customers, which often do not arise until years after the customer purchases his policy. To do this, they require those companies frequently to submit financial statements and actuarial opinions to insurance regulators and to maintain minimal capital reserves.[5] Consumer protection concerns motivated states to enact insurance regulations in the first place, and are the reason they include annuities within those regulations.
 
 
 30
 Our determination that the Retirement CD is the "business of insurance" is further supported by the legislative history of the McCarran-Ferguson Act. While the legislative history contains no explicit debate on whether annuities were intended to be either included or excluded, both the House and Senate incorporated in their deliberations on the Act an August 29, 1944 report by the National Association of Insurance Commissioners ("NAIC"), the voice of state insurance regulators. The NAIC's opinion was important to the debate of the Act, as evidenced by the fact that the statute was a "modification of a measure which was originally drafted by the legislative committee of the [NAIC]." 91 Cong.Rec. 483 (Jan. 25, 1945) (Sen. O'Mahoney). As printed in the Congressional Record, that report seems to suggest that annuities were considered to be part of the "business of insurance":
 
 
 31
 The insurance business has been alert to keep abreast with the ever-changing and expanding developments of American social and economic life.... Some idea of the complexity of the business may be gleaned from the fact that the insurance law of New York makes provision for 22 major kinds of insurance; namely, life, annuity, accident and health, fire, miscellaneous property, water damage, burglary and theft.... 90 Cong.Rec. A3975-77 (NAIC report introduced by Rep. Anderson) (emphasis added) (Aug. 29, 1944).[6]
 
 
 32
 Because the sale of the Retirement CD satisfies each of the Supreme Court's Pireno criteria, we conclude that the Retirement CD is properly considered the "business of insurance" for purposes of the McCarran-Ferguson Act.
 
 C.
 
 33
 The final question is whether the Bank Act is an act that "specifically relates to the business of insurance" within the meaning of the final clause in Section 1012(b) of the McCarran-Ferguson Act. Given the Supreme Court's recent decision in Barnett Bank, supra, we must conclude that the provisions of the Bank Act before us do not "specifically relate to the business of insurance."
 
 
 34
 In Barnett Bank, a Florida statute prohibited banks from selling most types of insurance. The statute was in direct conflict with Section 92 of the Bank Act, which expressly permits national banks to act as insurance agents in towns with populations of 5000 people or less. Thus the question was whether the McCarran-Ferguson Act allowed the state statute to stand in face of the National Bank Act. The Supreme Court concluded that the McCarran-Ferguson Act did not apply because Section 92 of the Bank Act "specifically relates to the business of insurance." In reaching that conclusion, the Court focused on the fact that Section 92 "explicitly" grants national banks permission to sell insurance, and contains "specific" rules prohibiting banks from guaranteeing premium payments or the truth of statements made by an assured. Barnett Bank, 517 U.S. at ---- - ----, 116 S.Ct. at 1111-1112. Thus Section 92 "not only focuses directly upon industry-specific selling practices, but also affects the relation of the insured to insurer and the spreading of risk." Id.
 
 
 35
 The provisions of the Bank Act before us--the power "to accept deposits" and "to enter into contracts"--contain language quite different from that in Section 92. Neither provision "explicitly grants banks permission to conduct insurance-related activity;" neither focuses "directly on specific [insurance] selling practices;" and neither "affects the relation of the insured to insurer and the spreading of risk." Id. Thus neither "specifically relates to the business of insurance."
 
 
 36
 This conclusion is supported by the Court's statements regarding the basic purpose of the McCarran-Ferguson Act. The Court concluded that the purpose of the Act was not to insulate state insurance regulation from the reach of all federal law, but "to protect state regulation primarily against inadvertent federal intrusion--say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to comprise one part." Id. at ----, 116 S.Ct. at 1112. As applied to the Retirement CD, the provisions of the Bank Act at issue are exactly the intrusion the Court warned against: they describe an affected activity (banking) in broad terms, of which the insurance business (the Retirement CD) is only a part.
 
 III.
 
 37
 The dissent expresses concern that even if we conclude that the McCarran-Ferguson Act allows Illinois to regulate the sale of the Retirement CD, we must then reach the "vexing" constitutional question of whether the banking activities of national banks are ever subject to state regulation. However, Barnett Bank demonstrates that the Bank Act possesses no unique immunity from the McCarran-Ferguson Act.
 
 
 38
 As stated above, the question in Barnett was whether a state statute could stand in the face of the Bank Act. The Court could have adopted the dissent's approach by concluding that the activities of national banks are simply not subject to state interference, regardless of the McCarran-Ferguson Act. However, that was not the approach taken by the Court. The Court undertook a detailed analysis of Section 92 and concluded that the anti-preemption rule did not apply because Section 92 "specifically related to the business of insurance." Id. at ----, 116 S.Ct. at 1113. Thus if the Court had concluded that Section 92 did not "specifically relate to the business of insurance," it would have applied the anti-preemption rule of the McCarran-Ferguson Act and allowed the Florida statute to stand in the face of the Bank Act. The Court left no doubt about this, as revealed in the following language:
 
 
 39
 An amicus argues that our interpretation would give the [McCarran-Ferguson] Act "little meaning," because "whenever a state statute 'regulates' the business of insurance, any conflicting federal statute necessarily will 'specifically relate' to the insurance business." Brief for American Council of Life Insurance as Amicus Curiae 4. We disagree. Many federal statutes with potentially pre-emptive effect ... use general language that does not appear to "specifically relate" to insurance; and where those statutes conflict with state law that was enacted "for the purpose of regulating the business of insurance," the McCarran-Ferguson Act's anti-pre-emption rule will apply. Id. (emphasis added).
 
 
 40
 Given Barnett Bank, we believe that the Bank Act, just like any other federal law, is within the reach of the McCarran-Ferguson Act.
 
 IV.
 
 41
 Because the relevant sections of the Illinois Insurance Code were "enacted for the purposes of regulating the business of insurance," and because the Retirement CD is a fixed annuity and properly considered the "business of insurance," the McCarran-Ferguson Act requires that the Bank Act not be interpreted to impair or supersede those sections. Thus we affirm the decision of the district court that Illinois may regulate the sale of the Retirement CD, despite the fact that selling the Retirement CD may be a practice that the National Banking Act expressly authorizes.
 
 
 42
 DIANE P. WOOD, Circuit Judge, concurring.
 
 
 43
 The Retirement CD that Blackfeet National Bank wants to offer in Illinois is, as the majority opinion notes, an innovative product. Therein lies the core difficulty for this case. In the face of the creativity and innovation that is taking place in financial markets, we are obliged to decide whether the act of offering this particular Retirement CD amounts to engaging in the "business of insurance," within the meaning of the 1945 statute commonly known as the McCarran-Ferguson Act, 15 U.S.C. § 1012. The dissent makes a number of compelling policy arguments, and I have little doubt that permitting national banks to issue innovative, hybrid instruments such as the Retirement CD would be beneficial to competition as a whole. Nevertheless, our job is not to question the wisdom of the statutes Congress has passed or the rules Congress has given us for determining how those statutes relate to one another. From that perspective, it seems clear to me that the principal opinion has come to the only conclusion that is consistent with the language of the relevant statutes, governing Supreme Court precedent and the economic function of the Retirement CD.
 
 
 44
 The dissent argues extensively that annuities should not be considered insurance products, noting a number of differences between the two products like the types of risks covered, the methods of payment, and the purposes for which they are designed. It notes, correctly, that many investment vehicles and contracts that address mortality risk are plainly not part of the "business of insurance." Where the dissent is ultimately unconvincing is in its application of the test for determining what constitutes the "business of insurance" as a matter of federal law for purposes of § 1012.
 
 
 45
 On this point, I agree that the Supreme Court's decisions in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 127-129, 102 S.Ct. 3002, 3007-3009, 73 L.Ed.2d 647 (1982), and Group Life & Health Ins. v. Royal Drug Co., 440 U.S. 205, 211-17, 99 S.Ct. 1067, 1073-76, 59 L.Ed.2d 261 (1979), establish the governing criteria both for the second (antitrust) clause of § 1012 and for the first clause. Under the first criterion, it is not enough to establish that the practice deals with a certain type of risk (here, mortality risk); we must go further and consider whether the practice has the effect of transferring or spreading that risk. To take one example from the dissent, a grantor assumes a mortality risk when she confers a life estate in land to another party, but there is no necessary transfer or spread of that risk to a larger population. The Retirement CD, in contrast, like all annuities, spreads mortality risk among all holders of the CD. If the issuer has good actuaries, it will earn money overall on its Retirement CDs, even if some individual customers live longer than their predicted life spans. Annuities are the same as life insurance policies in this respect: in each case, the accuracy of the issuer's predictions about the mortality of the customer population determines how profitable the issuer's business will be. For this purpose, it does not matter whether in one case the issuer is gambling that the customer will not die too soon, or in the other case it is gambling that the customer will not die too late. In both situations, there is an ascertainable risk that is spread or transferred. In addition, for the reasons the majority offers, the annuity aspect of the Retirement CD is an integral part of the contractual relationship between the issuer and the customer. Finally, even though other entities may issue annuities, dissent at 857 n. 22, the dissent offers no evidence to refute the statistics cited by amicus American Council of Life Insurance to the effect that the overwhelming majority of the $1 trillion of annuity contracts in the U.S. are issued by regulated insurance companies. Thus, the third factor of Pireno/Royal Drug is satisfied here as well.
 
 
 46
 The fact that Blackfeet is a national bank is important to the analysis only because it requires us to decide whether the "reverse preemption" provisions of the McCarran-Ferguson Act apply in these circumstances or not. The mere fact that national banks are permitted to sell the Retirement CD does not mean that contrary state regulation is supplanted. In Barnett Bank of Marion County v. Nelson, 517 U.S. 25, ----, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237 (1996), the Supreme Court noted that the purpose of the provision of the National Banking Act authorizing banks in towns with populations of less than 5,000 to sell insurance, 12 U.S.C. § 92, might have been to allow banks that power as long as states also gave their permission. The Court concluded that the unqualified language of the statute made that interpretation untenable. In this case, however, the Office of the Comptroller of the Currency (OCC) noted twice that state insurance laws might apply to the Retirement CD. Ante, at 837 n. 2. The OCC would certainly have taken a different tack if it believed that state laws necessarily had to yield to the powers of national banks to engage in this kind of business. I am therefore satisfied that our decision does not raise concerns under either the Supremacy Clause or the National Banking Act. The majority has simply reconciled two bodies of federal law in a manner that respects the Congressional limitations on each.
 
 
 47
 For these reasons, as well as for the reason set forth in the principal opinion, I agree that the judgment below must be affirmed.
 
 
 48
 FLAUM, Circuit Judge, dissenting.
 
 
 49
 This case boils down to one fundamental question: is the selling of the Retirement CD by national banks like Blackfeet appropriately characterized as "the business of insurance" under McCarran-Ferguson.[1] If the selling of this product by national banks is appropriately characterized as "the business of insurance," Illinois can choose to regulate the activity under its insurance code, and there is no federal preemption issue because McCarran-Ferguson directs that the "business of insurance" is presumed to be the province of the states.[2] 15 U.S.C. § 1012. But if the selling of this annuity product by a national bank is not "the business of insurance," McCarran-Ferguson does not protect Illinois' attempt to regulate this national bank practice.
 
 
 50
 As the majority properly recognizes, see supra p. 838, the meaning of "insurance" (or "the business of insurance") within a federal statute like McCarran-Ferguson is a federal question. See Securities and Exchange Comm'n v. United Benefit Life Ins. Co., 387 U.S. 202, 210, 87 S.Ct. 1557, 1561, 18 L.Ed.2d 673 (1967); Securities and Exchange Comm'n v. Variable Annuity Life Ins. Co., 359 U.S. 65, 69, 79 S.Ct. 618, 620, 3 L.Ed.2d 640 (1959) (hereinafter VALIC ). In VALIC, the Supreme Court noted that states disagree as to the nature of "insurance" and "annuity" contracts. The Court emphasized, however, that in the context of the federal Securities Act, "how the States may have ruled is not decisive.... [T]he meaning of 'insurance' or 'annuity' under ... Federal Acts is a federal question." Id. Thus a conclusion by Illinois, or any other state, that a particular practice constitutes "the business of insurance" has no bearing on our inquiry whether that state regulation actually qualifies as protected state insurance regulation under McCarran-Ferguson.[3] See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 230 n. 38, 99 S.Ct. 1067, 1082 n. 38, 59 L.Ed.2d 261 (1979).
 
 
 51
 In my view, were it not for the Supreme Court's recent, unanimous decision in NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), the majority's resolution of the difficult question at hand would be quite plausible and arguably correct. Upon careful consideration of the Court's approach in NationsBank, however, I do not believe we can confidently reach the conclusion reached by the majority. And when the NationsBank analysis is added to the substantial insurance literature and dictionary evidence specifically rejecting the claim that annuities are a type of "insurance," I must conclude that the selling of annuity-type instruments by national banks cannot reasonably be characterized as "the business of insurance" under McCarran-Ferguson, and thus subject to the Illinois Insurance Code.[4] Prior decisions from the Supreme Court and this circuit only strengthen this conclusion. In addition, the result reached by the majority raises the vexing constitutional question of whether a state can forbid activity by a national bank that is authorized under federal law.[5]
 
 I. The NationsBank
 Decision
 
 52
 The majority quite correctly notes that the NationsBank Court did not address the precise issue before us, since that decision involved the power of a national bank to act as a broker in the sale of annuities, not whether such a bank could directly issue annuities. In addition, that case did not involve any attempt by a state to regulate the activities of a national bank under its own insurance code. The Supreme Court appropriately limited its holding to the actual case before it, but that does not suggest that we should ignore the approach taken by the Court and the reasoning and authorities upon which it relied. Ultimately, in my judgment, the Court's analysis in NationsBank strongly points to the determination that the selling of annuities by national banks is not reasonably regarded as the business of insurance.
 
 
 53
 The NationsBank Court accepted the conclusion of the Comptroller of the Currency that annuities are widely recognized as "investment products."[6] Id. at ----, 115 S.Ct. at 814. Justice Ginsburg, writing for the entire Court, described annuities as follows:
 
 
 54
 By making an initial payment in exchange for a future income stream, the customer is deferring consumption, setting aside money for retirement, future expenses, or a rainy day. For her, an annuity is like putting money in a bank account, a debt instrument, or a mutual fund. Offering bank accounts and acting as agent in the sale of debt instruments and mutual funds are familiar parts of the business of banking.... In sum, modern annuities, though more sophisticated than the standard savings bank deposits of old, answer essentially the same need. By providing customers with the opportunity to invest in one or more annuity options, banks are essentially offering financial investment instruments of the kind congressional authorization permits them to broker.
 
 
 55
 Id. (emphasis added) (citations omitted). Hence the Court accepted the view that annuities are properly described as "investment instruments" and are analogous to bank accounts.
 
 
 56
 The NationsBank Court also addressed the argument, asserted by the respondents in that case and relied upon by the majority in this case, that annuities should be considered "insurance" because they traditionally have been sold by insurance companies. The Court stated: "[T]he sale of a product by an insurance company does not inevitably render the product insurance. For example, insurance companies have long offered loans on the security of life insurance, ... but a loan does not thereby become insurance." Id. The Court considered and rejected the proposition that a historical association of insurance companies with a particular product mandated the conclusion that the product is "insurance." The NationsBank Court also recognized that most states have regulated annuities as insurance, but noted that this regulation had more to do with the fact that insurance companies are likely to sell annuities than with a conclusion that annuities are insurance: "Treatment of annuities under state law ... is contextual. States generally classify annuities as insurance when defining the powers of insurance companies and state insurance regulators.... But in diverse settings, States have resisted lump classification of annuities as insurance." Id. (emphasis added) (citations omitted).[7]
 
 
 57
 The Court emphasized that a classification--such as the treatment of annuities as insurance within the confines of insurance law--that makes sense in one setting may not work in another: "As our decisions underscore, a characterization fitting in certain contexts may be unsuitable in others." Id. at ----, 115 S.Ct. at 816. Thus the NationsBank Court approved the Comptroller's "functional" approach to classifying annuities as "not 'insurance' " under the National Bank Act: "The Comptroller's classification of annuities, based on the tax deferral and investment features that distinguish them from insurance, in short, is at least reasonable." Id. at ----, 115 S.Ct. at 817. The Court recognized that the "key feature of insurance is that it indemnifies loss," id. (emphasis added), while annuities "serve an important investment purpose and are functionally similar to other investments that banks typically sell." Id. (emphasis added).
 
 
 58
 One other aspect of the NationsBank decision is important to note, particularly because the issue plays a prominent role in the majority's analysis: the concept of "mortality risk." The respondents in NationsBank argued, as the Illinois Director of Insurance does here, that annuities resemble insurance because some annuities contain a mortality risk element. The majority accepts this argument, but there are at least two significant reasons why this approach does not hold up. The first reason comes directly from NationsBank, while the second is more general and is addressed in section III below. Regarding NationsBank, the Supreme Court specifically rejected "mortality risk" as the hallmark of whether a product is "insurance" or not. The NationsBank Court noted that a life interest in real property imposes a "mortality risk" on the purchaser. Id. at ----, 115 S.Ct. at 816. The price of such an interest is presumably calculated according to the expected life of the purchaser (or whoever is to be used as the "measuring life"). If the purchaser lives longer than expected, say to the ripe old age of 110, the seller will be the loser-having sold the interest for less than it turned out to be worth. If the purchaser (or the person who is the measuring life) dies young, the purchaser will be the economic loser, since he or she will not have gotten the expected economic benefit out of the life interest. The "mortality risk" for the purchaser in such a life estate is the risk of dying before you have gotten the full value out of your purchased interest, while the risk for the seller is that the purchaser lives longer than expected. The NationsBank Court made clear, however, that "a life interest in real property is not insurance, although it imposes some mortality risk on the purchaser." Id. The Court further noted that some conventional debt instruments impose a similar mortality risk without thereby becoming "insurance." Id.
 
 II. The Literature
 
 59
 The opinion in NationsBank and other recent Supreme Court opinions considering the scope of "the business of insurance" are instructive not only for what they say, but for the sources they look to for authoritative support. The modern Court has shown a readiness to look to "the literature" on insurance, including insurance treatises, legal dictionaries, and general dictionaries, for guidance in determining the meaning of "insurance" and the appropriate scope of McCarran-Ferguson's "business of insurance" language. After reviewing this literature in regard to the question now before us, I find that it is nearly unanimous in directing us to the conclusion that the selling of a specialized annuity by a national bank is not "the business of insurance."
 
 
 60
 The NationsBank Court twice relied on Appleman & Appleman's insurance treatise as authoritative on the proper understanding of annuities and insurance--once for the proposition that annuities are primarily investment products, 513 U.S. at ----, 115 S.Ct. at 815, and once for the proposition that the sale of a product by an insurance company does not inevitably render the product insurance. Id. Appleman & Appleman recognize a clear distinction between "annuities" and "insurance." They note that annuities are often used as tax-saving devices and may be established by charitable gifts and gifts within a family, as well as being sold by institutions like insurance companies. 1 JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 81 (1981). In a section entitled "Annuities Issued by Life Insurance Companies," Appleman & Appleman specifically consider the question whether annuities are "insurance" and decisively find that they are not. Id. at § 84. They begin as follows: "Ordinarily, it is recognized, even by laymen, that contracts of life insurance and of annuity are distinctly different."[8] Id. They note that life insurance generally involves the insured making set payments, called "premiums," over a period of years that entitle a designated person other than the insured to payment of a fixed amount in the event of the insured's death. They point out that "[a]n annuity contract is almost diametrically opposed to this," since it traditionally involves the designated recipient paying for the product, while the issuer takes on the obligation of making periodic (usually yearly) payments in a fixed amount. Id. Rather than "creating an immediate estate for the benefit of others," as the purchaser of insurance does, the purchaser of an annuity "has reduced his immediate estate in favor of future contingent income." Id. Appleman & Appleman conclude: "Annuity contracts must, therefore, be recognized as investments rather than as insurance." Id. (emphasis added) (quoted in NationsBank, 513 U.S. at ----, 115 S.Ct. at 815).
 
 
 61
 The Supreme Court has also relied upon Couch's Cyclopedia of Insurance Law when addressing questions about the nature of insurance, particularly the risk-spreading aspect of insurance. See, e.g., Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 127 n. 7, 130, 102 S.Ct. 3002, 3008 n. 7, 73 L.Ed.2d 647 (1982); Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979). Couch entitles one of his sections "Annuity as Distinguished from Insurance." 19 GEORGE J. COUCH, CYCLOPEDIA OF INSURANCE LAW § 81:2 (2d ed. 1983). In this section Couch considers various state, federal, and Supreme Court decisions, as well as legal and insurance commentary, all of which point to the conclusion that annuities are generally not "insurance." Couch concludes,
 
 
 62
 An annuity contract differs materially from an ordinary life insurance contract in that it is payable during the life of the annuitant rather than upon a future contingency, and in many instances it is paid for in a single payment which is not generally regarded as a premium. Consequently, a company engaged in selling annuities is not subject to a statute applicable to "insurers" unless the statute expressly so declares.
 
 
 63
 Id. at § 81:2, pp. 688-89. Under the Couch analysis, the selling of annuities should not be considered "the business of insurance" under the McCarran-Ferguson Act, since the Act does not expressly define the issuing of annuities as part of "the business of insurance."[9]
 
 
 64
 The two dominant legal encyclopedias, American Jurisprudence ("Am.Jur.") and Corpus Juris Secundum ("C.J.S."), likewise strongly direct the conclusion that annuities are not "insurance" and that the selling of annuities is not "the business of insurance." C.J.S., in particular, does an excellent job of illuminating the distinction between annuities and true insurance products. C.J.S. notes that the term "annuity," as it is currently used, "designates a fixed sum, granted or bequeathed, payable periodically, at aliquot parts of a year, at stated intervals, and not necessarily annually." 3A C.J.S. Annuities § 2 (1973). C.J.S. also recognizes annuities as being a form of investment, rather than a brand of life insurance: "An annuity is not an indemnity against loss of death, but is essentially a form of investment, notwithstanding the fact that in its usual form payments are dependent upon the continuity of the grantee's life." Id. The basis for this conclusion is explained in a later section that specifically addresses the difference between annuities and insurance.
 
 
 65
 An annuity contract differs from an insurance contract, and it comprehends few of the elements of an insurance contract. An annuity contract is distinguished from an insurance contract in that insurance, as generally understood, is an agreement to indemnify against loss in case of property damaged or destroyed or to pay a specified sum on the death of insured or on his reaching a certain age, while an annuity is generally understood as an agreement to pay a specified sum to the annuitant annually during life.
 
 
 66
 From an insurer's viewpoint insurance looks to longevity, while annuity looks to transiency. An annuity is a provision for life with no indemnity feature; the risk assumed is to pay as long as the insured may live, and it is not based on contingency of loss.
 
 
 67
 The existence of the contingency that payments are dependent upon the continuity of the annuitant's life does not bring an annuity within the classification of insurance. An annuity is not an insurance contract [even if] it provides for death benefits, refund annuities, or continuation of payments to a designated person after the primary beneficiary's death.
 
 
 68
 Id. at Annuities § 3(c) (emphasis added).
 
 
 69
 The C.J.S. chapter on "insurance," which has been updated recently, reaffirms the distinction between annuities and insurance. C.J.S. recognizes that "the underwriting of risk" has been commonly conceived by the courts and in popular understanding as the "earmark of insurance." 44 C.J.S. Insurance § 2(a) (1993); see, e.g., VALIC, 359 U.S. 65, 73, 79 S.Ct. 618, 623, 3 L.Ed.2d 640 (1959); see also infra section III. This underwriting of risk involves two basic elements: the shifting of loss from the insured to the insurer (commonly called "risk transfer") and a distribution of risk among similarly situated persons (often called "risk spreading"). 44 C.J.S. Insurance § 2(a). But the term "risk" in the insurance context is used in a narrow, specific sense that accords with the traditional definition of "insurance." C.J.S. notes that "risk" in the insurance sense deals with loss or injuries that occur due to a "particular peril" that is insured against (such as death, fire, accident, or property damage), which results from the occurrence of a specific "casualty" or "fortuitous event"--an event which, so far as the parties to the contract are concerned, is dependent on chance. Id. at Insurance § 860. Accordingly, "Insurance has been said to be best defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event." Id. at § 2(a) (all emphasis added).
 
 
 70
 Annuities, however, do not involve indemnification, loss/damage/liability, or contingent events. Annuities generally involve fixed payments determined by an agreed-upon investment feature (principal plus a guaranteed rate of interest),[10] rather than by the need to indemnify a particular economic loss. Annuity payments are given out according to a pre-set schedule, rather than when something "bad" happens. Thus there is no loss, damage, or liability component. Annuity payments do not commence with a contingent event, but rather begin on a contractually-established date and continue over a period of time--either to a pre-set ending point (such as a period of years) or until the occurrence of a contingent event (such as the death of the annuitant).[11] After considering the implications of the C.J.S. definition of "insurance," it is not surprising that the C.J.S. treatment of annuity contracts in this chapter is short and conclusory: "Generally an annuity contract is not a contract of insurance." Id. at § 2(b).
 
 
 71
 Am.Jur. likewise defines "insurance" in a way that seems to preclude a finding that an annuity could qualify as insurance. Am.Jur. recognizes that "insurance," even broadly defined, provides for the payment of "a certain or ascertainable sum of money on a specified contingency." 43 AM.JUR.2D Insurance § 1. Am.Jur. also notes that the authorities substantially agree that insurance involves a payment "on the destruction, death, loss, or injury of someone or something by specified perils." Id. Am.Jur. thus recognizes that an insurance contract traditionally comes to fruition with the occurrence of "an unknown or contingent event" or a "specified peril." Id. Hence its conclusion regarding annuities, by now familiar, is not surprising: "Contracts for annuities differ materially from ordinary life insurance policies, and are not generally regarded as such. Consequently, a company engaged merely in selling annuities does not conduct an insurance business, and is not an insurance company unless made so by a broad statutory definition of insurance companies." Id. at Insurance § 5 (emphasis added). Once again, McCarran-Ferguson does not define "insurance" to include annuities, nor does it define "insurance company" so as to include an entity that merely sells annuities.
 
 
 72
 This literature section would not be complete without also addressing the dictionary evidence on the meaning of "insurance." The Supreme Court has looked to Black's Law Dictionary and Webster's New International Dictionary in this regard. See, e.g., NationsBank, 513 U.S. 251, ----, 115 S.Ct. 810, 817, 130 L.Ed.2d 740 (1995) (quoting the Black's Law Dictionary definition of "insurance"); Royal Drug, 440 U.S. 205, 211 n. 7, 99 S.Ct. 1067, 1073 n. 7, 59 L.Ed.2d 261 (1979) (quoting Webster's New International Dictionary definition of "insurance"). I do the same. Black's defines "insurance" as follows:
 
 
 73
 A contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils.... A contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event and is applicable only to some contingency or act to occur in the future.
 
 
 74
 BLACK'S LAW DICTIONARY 802 (6th ed. 1990). Once again, the emphasis on loss that occurs due to some specific peril or contingent event, at which time (and not before), the protected party will be indemnified simply does not allow for the conclusion that an annuity can qualify as "insurance." Not only is the language of insurance ("underwrite," "policy," "premium," etc.) totally different from that of annuities, the substance and effect of an insurance agreement is totally different from that of an annuity agreement.[12]
 
 
 75
 Webster's definition of "insurance" simply substantiates and echoes those provided above. It reads as follows:
 
 
 76
 1a: the action or process of insuring or the state of being insured usu. against loss or damage by a contingent event (as death, fire, accident, or sickness) b: means of insuring against loss or risks ... 2a: the business of insuring persons or property; specif.: a device for the elimination or reduction of an economic risk common to all members of a large group and employing a system of equitable contributions out of which losses are paid b: coverage by contract whereby for a stipulated consideration one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril....
 
 
 77
 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1173 (1993) (emphasis in original). By now the refrain is more than familiar to the reader. The focus on indemnifying against economic loss/damage due to future, contingent events/perils simply belies any attempt to place annuities within the ambit of the term "insurance." Insurance companies may well be allowed to sell annuities, just as they are sometimes allowed to make loans, but they are not engaging in the "business of insurance" when they do so.
 
 
 78
 Yet amidst the modern literature on the scope of "insurance," there is at least one respected treatise that does appear to place some annuities within the realm of "insurance." See ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW § 1.5(c) (1988) (stating that the class of insurance termed "life insurance" includes traditional life insurance, personal accident insurance, health insurance, and annuity contracts). And the Supreme Court has looked to Keeton's insurance law treatise for guidance in previous insurance cases--though never for the proposition that an annuity can be considered "insurance" and not in NationsBank--so it seems prudent to consider it here. See, e.g., Pireno, 458 U.S. 119, 127 n. 7, 131, 102 S.Ct. 3002, 3008 n. 7, 3009, 73 L.Ed.2d 647 (1982) (citing Keeton for recognition of risk transfer and distribution elements of insurance and for claim that insurance policy itself defines scope of risk transferred); Royal Drug, 440 U.S. 205, 211, 99 S.Ct. 1067, 1072, 59 L.Ed.2d 261 (1979) (citing Keeton's description of insurance as "arrangement for transferring and distributing risk"). Although Keeton emphasizes the significance of the risk transfer and distribution elements of "insurance," he recognizes that these components alone do not make something "insurance." "Insurance is generally understood to be an arrangement for transferring and distributing risks. Unfortunately, this characterization is neither very precise nor universally applicable as a definition of insurance because it describes many other arrangements and relationships which almost uniformly are not regarded or treated as insurance transactions." Id. § 1.1(b). Specifically, Keeton notes that a warranty that guarantees the quality of merchandise, an agreement to maintain a vehicle in good repair, and even an attorney's agreement to take a case for a fixed fee all involve risk transfer and risk distribution; yet such contractual arrangements "almost uniformly are not treated as insurance transactions" and are not subject to state insurance codes. Id. at § 1.2.
 
 
 79
 Thus Keeton recognizes the difficulty of formulating an appropriate, generalizable definition of "insurance," and he emphasizes that a definition suitable in one context may be lacking in another: "There is no single conception of insurance that is universally applicable for use in disputes involving questions of law." Id. § 1.1(b). Nonetheless, Keeton does offer a basic definition of "insurance," which accords with the definitions considered above. He writes, "An insurance contract generally involves an agreement by which one party (usually identified as an insurer) is committed to do something which is of value for another party (usually identified as an insured or a beneficiary) upon the occurrence of some specified contingency." Id. (emphasis added). Yet this definition, even acknowledging Keeton's caveat about not demanding perfect, overarching definitions, raises substantial questions about Keeton's willingness to treat some annuities as "insurance."
 
 Keeton describes annuities as follows:
 
 80
 An annuity contract ordinarily provides for the payment of a fixed-dollar annual benefit commencing at a specified date and continuing as long as the annuitant lives. The traditional annuity contract is in essence and in principal purpose a risk transferring and a risk distributing contract, and this type of contract is frequently treated as a form of insurance. The uncertainty in this context is the risk of long life, in which case the annuity contract will pay the annuitant substantially more than the company received (as a result of both premium payments and investment earnings) on behalf of that annuitant to create the annuity benefit.
 
 
 81
 Id. at § 1.5(c)(4) (emphasis added). What Keeton does not explain (and what the other commentators appear to find decisive) is why a product that provides for payment "upon the occurrence of" some specified event (i.e., beginning with that event), as insurance does, should be treated as equivalent to a product that provides for payment "as long as" or until some specified event occurs (i.e., ending with that event), as an annuity does. The majority notes this feature by calling annuities the "mirror image" of insurance. See supra p. 840. But to my mind, the mirror image of something is the reverse of that thing, which in this case amounts to annuities being the opposite of insurance.
 
 
 82
 Keeton does note that "refund annuities" are more like investments, and less like insurance, than traditional annuities.[13] KEETON at § 1.5(c)(4). The Retirement CD is a refund annuity. The purchaser of the Retirement CD is guaranteed a return of at least the accrued value (principal plus interest) of the CD up until the maturity date. If the purchaser dies before the maturity date, the value of the CD at the time of death (all contributions made plus accrued interest) will be disbursed to the annuitant's estate or designated beneficiary. Likewise, if the annuitant dies after the maturity date but before the annuity payments received total the value of the CD as of the maturity date, the annuitant's estate or designated beneficiary will be given the difference between the value of the CD as of the maturity date and the total of the payments already received. Thus it is even more inappropriate to call the Retirement CD "insurance" than it is to call traditional annuities "insurance." Perhaps Keeton himself would not do so.
 
 III. Caselaw
 
 83
 The parties have not presented, and I am not aware of, any Supreme Court or federal circuit court case that addresses the issue before us: the power of a state to regulate as "insurance" the selling of an annuity product by a national bank. The recent NationsBank case, discussed in section I above, is the most relevant authority on the issue, but some of the other cases relied upon by the majority are worth taking up, both for the aid they can provide in addressing the issue before us and to recognize their limitations.
 
 
 84
 The concept of "mortality risk" and the distinction between "insurance risk" and other types of risk have been addressed by the Supreme Court as early as the 1940's and 50's. In Helvering v. Le Gierse, 312 U.S. 531, 539, 61 S.Ct. 646, 649, 85 L.Ed. 996 (1941), the Court emphasized that for a contract to qualify as "insurance" under a federal statute, it must contain "an actual 'insurance risk.' "[14] The Le Gierse Court explained that implicit in "the word 'insurance' in its commonly accepted sense .... is acknowledgement of that fact that usually insurance payable to specific beneficiaries is designed to shift to a group of individuals the risk of premature death of the one upon whom the beneficiaries are dependent for support." Id. at 540, 61 S.Ct. at 649. In other words, the "insurance risk" shifted through life insurance is the economic risk of losing a breadwinner. The Le Gierse Court also contrasted the "insurance risk" of true insurance with the "investment risk" of annuities and stated that "annuities and insurance are opposites." Id. at 542, 541, 61 S.Ct. at 650.
 
 
 85
 Similarly, in Securities and Exchange Comm'n v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (VALIC ) (cited by the majority supra p. 841), the Court considered whether the variable annuities at stake were "insurance" for purposes of the Securities Act of 1933, McCarran-Ferguson, and the Investment Company Act.[15] After noting that the question at stake was one of federal law, id. at 69, 79 S.Ct. at 620, the Court considered the respondents argument that the variable annuities contained "mortality risk," which made them "insurance."[16] The Court found that this "mortality risk" element did not, however, make the variable annuities "insurance": "The risk of mortality, assumed here, gives these variable annuities an aspect of insurance. Yet it is apparent, not real; superficial, not substantial." Id. at 71, 79 S.Ct. at 622 (emphasis added). The Court emphasized that since the variable annuities did not involve any fixed return, all the investment risk remained with the annuitant, not the issuer. Thus there was "no true risk in the insurance sense.... There is no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage." Id. at 71-73, 79 S.Ct. at 621-23.
 
 
 86
 The VALIC Court clung to a stricter definition of "insurance" than the one proposed by the Securities and Exchange Commission. The Court noted that the annuity contracts did have "one true insurance feature," since they provided life insurance to insurable applicants 60 years of age or younger on a decreasing basis for five years. Nonetheless, the Court found that even this true insurance feature was "ancillary and secondary to the annuity feature" and thus did not turn the annuities into "insurance." Id. at 72 n. 15, 79 S.Ct. at 623 n. 15. Although the VALIC Court did mention "mortality risk" in the sense that today's majority relies upon, the issue at stake was not this risk, but the necessity of financial risk-taking on the part of the insurance company. The variable annuities imposed little economic risk on the issuing insurance companies, since the return on the annuity simply varied with the success of the insurance companies' investments. Id. at 69-70, 79 S.Ct. at 620-21. This led the Court to find that the annuities at issue were not "insurance." The VALIC Court did not offer a general definition of "insurance," noting instead that it "would not undertake to freeze" the concepts of "insurance" and "annuity" according to their meaning at the time the federal statutes were passed.[17] Id. at 71, 79 S.Ct. at 621. It simply emphasized that "insurance" must involve some economic risk-taking on the part of the insurance company. Id.
 
 
 87
 In more recent cases the Supreme Court has continued to emphasize that the risk transferred by "insurance" must be an insurance type risk, not just any old risk: "Both the 'spreading' and the 'underwriting' of risk refer in this context to the transfer of risk characteristic of insurance." Pireno, 458 U.S. 119, 130, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982) (emphasis added). In addition, the Royal Drug Court, while discussing the risk-spreading characteristic of insurance, cited the Webster's New International Dictionary definition of "insurance," which states that insurance must protect against "loss or damage by a contingent event" or by a "specified contingency or peril." 440 U.S. 205, 211 n. 7, 99 S.Ct. 1067, 1073 n. 7, 59 L.Ed.2d 261 (1979); see supra section II for full text of Webster's definition.
 
 
 88
 As the treatises and definitions discussed in section II reveal, we define "the business of insurance" too broadly if we fail to recognize the necessary connection to a contingent event or peril. Although the Supreme Court has not yet had to focus on this necessity, since it did not impact the cases considered, the definition quoted in Royal Drug, along with the modern Court's repeated reliance on sources like Webster's, Couch, and Appleman & Appleman for addressing definitional questions in the insurance realm, see supra section II, strongly suggest that the Court would recognize that "insurance" under McCarran-Ferguson requires that coverage commence only with the happening of a contingent event or specified peril. Annuities, such as the Retirement CD, do not possess this characteristic, and thus cannot qualify as "insurance."
 
 
 89
 It should be emphasized in the context of the current discussion that none of the Supreme Court cases dealing with McCarran-Ferguson (or other insurance issues) have been about the power of states to regulate the selling of annuities as insurance. In fact, the cases cited by both sides have almost all involved attempted regulation of state-licensed insurance companies under federal securities and antitrust laws, rather than the regulation of federal entities under state insurance codes. The issues at stake in the Supreme Court's "insurance cases"[18] fall into three basic categories: 1) whether a particular state statute was enacted "for the purpose of regulating the business of insurance" under McCarran-Ferguson, thus preempting an overlapping federal statute, see United States Dep't of the Treasury v. Fabe, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (holding that state insolvent insurance company statute giving claims by United States fifth priority, while federal bankruptcy statute would give them first, escapes federal preemption to extent that it protects policyholders and covers administrative costs); Securities and Exchange Comm'n v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (holding that state law aimed at protecting insurance company shareholders, rather than policyholders, not enacted for purpose of regulating "the business of insurance"); 2) whether a particular practice by an insurance company relates to "the business of insurance," such that the McCarran-Ferguson antitrust exemption applies,[19] see Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) (holding that insurance company use of "peer review" process to determine coverage for submitted claims does not constitute "the business of insurance"); Royal Drug, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (holding that insurance company "Pharmacy Agreements" providing for $2 prescription drugs at participating pharmacies do not constitute "the business of insurance," since agreements made with pharmacies rather than policyholders); and 3) whether a particular product sold by an insurance company falls within the exemption for insurance policies and annuity contracts under the Securities Act,[20] see United Benefit, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (holding that deferred annuity contract not exempt because it is essentially "investment contract" during accumulation phase); see also VALIC, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (discussed above).[21]
 
 
 90
 Recognizing the scope of the insurance cases considered by the Supreme Court thus far, and how the focus of these cases differs from the one at hand, serves to demonstrate the limitations of these cases for deciding the issue before us. In particular, the three-part test cited by the majority for determining what constitutes "the business of insurance" under McCarran-Ferguson, see supra p. 838, has an impressive pedigree of Supreme Court endorsement, yet proves largely inappropriate and unhelpful to answering the question now before us. The three criteria first evolved in the Royal Drug case and were later summarized by the Court in Pireno as follows:
 
 
 91
 first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.
 
 
 92
 458 U.S. at 129, 102 S.Ct. at 3009. Moreover, the Court recently reaffirmed this "tripartite standard for divining what constitutes the 'business of insurance.' " Fabe, 508 U.S. at 497, 113 S.Ct. at 2206 (citing Pireno).[22] Unfortunately, this test arose in the context of cases considering the activities of insurance companies. All three criteria, and particularly the second criterion, appear directed at examining an insurance company practice--not a practice by a non-insurance company that may arguably be termed "the business of insurance." The Retirement CD, at least on its face, does not involve "policyholders," a "policy relationship," an "insurer," or an "insured." And as for the third criterion, it simply restates the very question before us: should the selling of this particular product be limited to entities within the insurance industry?[23] The most relevant part of the test is the first criterion--whether the practice has the effect of transferring or spreading a policyholder's risk--but it alone cannot be decisive.
 
 
 93
 Two additional points demonstrate the limitation of the Supreme Court's pre-NationsBank McCarran-Ferguson jurisprudence for addressing the question now before us. First, the Court's stated approach to understanding the scope of McCarran-Ferguson reveals that it has always been considering insurance company practices. Since 1969 the Supreme Court has steadfastly asserted that the focus of McCarran-Ferguson is on "the relationship between the insurance company and the policyholder." National Securities, 393 U.S. 453, 460, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969); Royal Drug, 440 U.S. at 216, 99 S.Ct. at 1075; Pireno, 458 U.S. at 128, 102 S.Ct. at 3008; Fabe, 508 U.S. at 500, 113 S.Ct. at 2208. Obviously, such a focus falls short in the case at hand, as there is no such "relationship" to protect. The Retirement CD relationship involves no insurance companies and arguably no "policyholders." Similarly, the Court has sometimes emphasized that the McCarran-Ferguson "reverse preemption" doctrine is directed at "the 'business of insurance' and not the 'business of insurance companies.' " Royal Drug, 440 U.S. at 217, 99 S.Ct. at 1076; Pireno, 458 U.S. at 129, 102 S.Ct. at 3008 (quoting Royal Drug); National Securities, 393 U.S. at 459-60, 89 S.Ct. at 568-69 ("Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does [McCarran-Ferguson] apply."). In these cases the Court has recognized limitations on the federal preemption exemption under McCarran-Ferguson, noting that certain activities of insurance companies remain subject to federal law (i.e., that certain insurance company activities do not constitute "the business of insurance").[24] The Court has not yet considered a case, however, where a state properly regulated the conduct of a non-insurance company under its McCarran-Ferguson power to regulate "the business of insurance."[25]
 
 IV. State Regulation of National Banks
 
 94
 Since the infancy of our nation and by way of some of the most noted Supreme Court decisions in our history, national banks have been protected from intrusive regulation by the states.[26] Thus if we conclude, as the majority does, that McCarran-Ferguson allows the State of Illinois to regulate the selling of annuities by national banks, we must then consider whether McCarran-Ferguson trumps the countervailing federal principle, enshrined in the National Bank Act, that the banking activities of national banks are governed by federal law and generally should not be interfered with by the states. This principle was just reaffirmed by the Supreme Court in Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, ----, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237 (1996), where the Court referred to our history of national bank legislation as follows: "That history is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." Thus the majority's interpretation of "the business of insurance" poses a conflict not merely between state law and federal law (which in the McCarran-Ferguson context would usually allow state law to prevail), but between two overriding principles of federal law: the supremacy of the federal government in regulating national banks (the National Bank Act) and the presumed autonomy of the states in regulating the business of insurance (McCarran-Ferguson).
 
 
 95
 The tradition against allowing state intrusion into the activities of national banks is a long and lofty one. In Easton v. Iowa, 188 U.S. 220, 229, 23 S.Ct. 288, 290, 47 L.Ed. 452 (1903), the Supreme Court recognized that "[t]he principles enunciated in M'Culloch v. Maryland ... and in Osborn v. Bank of United States [22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824)] ..., though expressed in respect to banks incorporated directly by acts of Congress, are yet applicable to the later and present system of national banks." The Easton Court was considering an attempt by Iowa to apply their state banking statute, which forbid the receipt of deposits by insolvent banks, to a national bank. While it did not question the wisdom of such a statute or suggest that it was being applied unevenly within Iowa, the Court soundly rejected the state's attempt to apply it to a national bank. The Easton Court emphasized the public, independent, and national character of the national bank system, id. at 229-30, 23 S.Ct. at 290, and concluded that "[s]uch being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by state legislation...." Id. at 230, 23 S.Ct. at 290 (emphasis added).
 
 
 96
 In regard to the policy arguments made by the State of Iowa regarding the importance of protecting bank customers--which parallel the consumer protection arguments made by the State of Illinois in the present case--the Easton Court's response was two-fold. First, the Court noted that national banks are regulated by federal law and that these provisions do seek to protect the depositors and creditors of national banks from fraudulent banking. Id. at 230, 23 S.Ct. at 290. Second, in response to the Iowa Attorney General's suggestion that the state provisions were valuable for holding the banks to a "higher degree of diligence," which in turn would "give[ ] the general public greater confidence in the stability and solvency of national banks," id. at 231, 23 S.Ct. at 291, the Court simply relied on the absence of Congressional intent to allow such extra protection:
 
 
 97
 [W]e are unable to perceive that Congress intended to leave the field open for the states to attempt to promote the welfare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.
 
 
 98
 Id. at 231-32, 23 S.Ct. at 291. Our answer to the consumer protection arguments of Illinois should be of a piece. If Congress has not allowed for such state control of these national bank activities, it is no response to say (as Illinois does) that the state can better protect customers than the Comptroller of the Currency can. The issue is one of authority and power, not competency and expertise. The Easton Court concluded that "it is not competent for state legislatures to interfere, whether with hostile or friendly intentions, with national banks or their officers in the exercise of the powers bestowed upon them by the general government." Id. at 238, 23 S.Ct. at 293.
 
 
 99
 In First National Bank of San Jose v. California, 262 U.S. 366, 43 S.Ct. 602, 67 L.Ed. 1030 (1923) (hereinafter San Jose), the Court relied upon themes similar to those in Easton. While rejecting an attempt by the State of California to apply its escheat law (providing that unclaimed deposits in bank accounts inactive for more than twenty years would escheat to the state) to a national bank, the Court noted that national banks "are instrumentalities of the federal government." Id. at 368, 43 S.Ct. at 603. The San Jose Court emphasized that "any attempt by a state to define their duties or control the conduct of their affairs is void, whenever it conflicts with the laws of the United States or frustrates the purpose of the national legislation, or impairs the efficiency of the bank to discharge the duties for which it was created." Id. at 369, 43 S.Ct. at 603. In particular the Court noted: "Plainly, no state may prohibit national banks from accepting deposits, or directly impair their efficiency in this regard." Id. Such state regulation would "seem incompatible with the purpose to establish a system of governmental agencies specifically empowered and expected freely to accept deposits from customers irrespective of domicile...." Id. at 370, 43 S.Ct. at 603. The San Jose Court concluded by citing a long list of cases, including M'Culloch v. Maryland, Osborn v. Bank of the United States, Easton, and others, as support for the statement that it had "often pointed out the necessity for protecting federal agencies against interference by state legislation." Id.
 
 
 100
 Over thirty years later, in Franklin National Bank v. New York, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954), the Court continued to emphasize the sovereignty of national banks in their authority to receive deposits unimpeded by state regulations. This time the Court rejected the State of New York's attempt to apply to national banks an advertising statute that prohibited use of the word "savings" in bank names and advertising. The Court noted that "The National Bank Act authorizes national banks to receive deposits without qualification or limitation, and it provides that they shall possess 'all such incidental powers as shall be necessary to carry on the business of banking....' " Id. at 376, 74 S.Ct. at 552-53. The Court found that modern competition for banking business necessitated the use of advertising, but could see "no indication that Congress intended to make this phase of national banking subject to local restrictions." Id. at 378, 74 S.Ct. at 554. Thus it determined that there was "a clear conflict" between the freedom to advertise under federal law and the restrictions of New York law that had to be resolved in favor of federal law "as a matter of supremacy." Id. at 378-79, 74 S.Ct. at 554. "However wise or needful [the state] policy, ... it must give way to the contrary federal policy." Id. at 379, 74 S.Ct. at 554.
 
 
 101
 The Court has never retreated from its insistence that state laws not be allowed to interfere with the federally authorized activities of national banks, particularly in regard to specifically authorized activities like the taking of deposits. Even in First National Bank in Plant City, Fla. v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (hereinafter Plant City), where the Court did allow the application of a Florida branch banking statute to national banks in the state, the Court maintained that "Congress has absolute authority over national banks." Id. at 131, 90 S.Ct. at 342. The difference in Plant City was that the national statute on branch banks incorporated state law as to "when, where, and how" any bank branch office could be operated. Id. at 130, 90 S.Ct. at 341 (citing the McFadden Act, 12 U.S.C. § 36(c)). Even the parties in Plant City agreed that the McFadden Act permitted national banks to have branch offices "if and only if the host State [would] permit one of its own banks to branch." Id. Thus allowing application of the state branch bank statute to national banks in Florida did not in any way undermine the Supreme Court's established jurisprudence regarding the supremacy and independence of national banks.
 
 
 102
 Just this term in Barnett Bank, the Supreme Court invoked the decisions in Easton, San Jose, and Franklin National Bank to emphasize that the history of national bank jurisprudence has been one of reading national bank powers broadly and minimizing state interference with the exercise of these powers. 517 U.S. at ---- - ----, 116 S.Ct. at 1108-09. The Court concluded, "In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." Id. at ----, 116 S.Ct. at 1109. The Court noted that this leaves some room for state regulation, at least when it does not prevent or significantly impair the exercise of national bank powers.[27] Id. In particular, the Barnett Bank Court recognized that when a federal banking statute explicitly provides for state law oversight, as in the Plant City case, consistent state regulation is allowed. Id. (citing Plant City). The Barnett Bank Court emphasized, however, that "where Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." Id. (citing Franklin National Bank, 347 U.S. at 378, n. 7, 74 S.Ct. at 554 n. 7 [listing examples], for principle that where Congress intends to subject national banks to local restrictions, it does so expressly).[28]
 
 
 103
 The majority seems to read Barnett Bank as making some kind of broad statement that McCarran-Ferguson normally trumps the National Bank Act. See supra p. 843 ("Barnett Bank demonstrates that the Bank Act possesses no unique immunity from the McCarran-Ferguson Act."). Yet Barnett Bank contains no such message or suggestion. Barnett Bank involved a convergence, rather than a conflict, between the National Bank Act and McCarran-Ferguson; thus there was no need to consider which statute would control. The Court simply recognized that McCarran-Ferguson itself allows for federal law to preempt state insurance law when the federal statute "specifically relates to the business of insurance."[29] 517 U.S. at ----, 116 S.Ct. at 1106 (citing McCarran-Ferguson, 15 U.S.C. § 1012(b)). And since the federal banking provision at issue, 12 U.S.C. § 92, specifically provides for the sale of insurance by national banks in small towns, the Court found that this statute fit neatly within the McCarran-Ferguson exception to state supremacy over "the business of insurance." Id. at ----, 116 S.Ct. at 1111 ("[U]sing ordinary English, one would say that this statute specifically relates to the 'business of insurance.' ") (emphasis in original). Barnett Bank was about the meaning of "specifically relates," not the meaning of "the business of insurance"--no one contested that the national banks desired to sell insurance. As such, it provides no aid in answering the fundamental question in the case at hand: whether national banks selling annuities like the Retirement CD are engaged in "the business of insurance."[30] Barnett Bank's primary relevance for our inquiry is its strong affirmation of the presumed power of national banks to engage in banking activities free from state interference.
 
 
 104
 Neither the majority nor the appellee have provided any reason for retreating from the Supreme Court's endorsed stance of robust protection of national banks from state interference with their banking activities. In fact, neither the majority nor the appellee even addresses this weighty issue.[31] But it is an issue that cannot simply be ignored. If we are to approve Illinois's current attempt to regulate the national bank activity at issue, we should do so explicitly and only after consideration of the long and weighty tradition against allowing state intrusion into the federally authorized activities of a national bank, particularly the taking of deposits. Under my approach to the "business of insurance" question under McCarran-Ferguson, we need not address the daunting issue of a state regulating the national bank activity of issuing the Retirement CD. Since Illinois would have no McCarran-Ferguson authority to regulate the activity as "the business of insurance," we would not have to consider whether this state regulation accorded with the national and independent nature of national banks.
 
 
 105
 The only seeming escape from this quandary for the majority and the appellee would be a conclusion that the offering of the Retirement CD is not truly a banking activity authorized by the National Bank Act. For purposes of its analysis, the majority assumes that the appellant national banks are authorized to sell the Retirement CD under federal law. See supra p. 837. But I would like to conclude by going one step further, particularly since leaving open the possibility that this activity is not authorized by federal law could invite speculation that the immediately preceding analysis is irrelevant to the case at hand.
 
 
 106
 The Supreme Court in NationsBank has recently reminded us that the Comptroller of the Currency has been "charged by Congress with superintendence of national banks" and is "the administrator charged with supervision of the National Bank Act ... [who] bears primary responsibility for surveillance of 'the business of banking.' " 513 U.S. 251, ----, ----, 115 S.Ct. 810, 812, 813, 130 L.Ed.2d 740 (1995). The Court emphasized the great deference to be accorded "to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." Id. at ----, 115 S.Ct. at 813 (quoting Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 403-404, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987)). The NationsBank Court set forth in bold terms the rule for evaluating the determination of an administrator in interpreting the statute with which he or she has been entrusted: "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.' " Id. at ---- - ----, 115 S.Ct. at 813-14 (emphasis added) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). Thus we are required to view the Comptroller of the Currency's interpretation of the National Bank Act through a very deferential lens.
 
 
 107
 On May 12, 1994, the Office of the Comptroller of the Currency ("OCC") issued a letter to Blackfeet National Bank stating that it had "no objection to a national bank marketing [the] Retirement CD," subject to the safety and soundness conditions set forth in the letter. The OCC looked to the powers given national banks under 12 U.S.C. § 24 (Third and Seventh) and concluded that "the express authorizations for the Bank to receive deposits and enter into contracts, coupled with its powers to incur liabilities and fund its operations, clearly make the Retirement CD an authorized Bank activity" (emphasis added).[32] In fact, the OCC repeatedly emphasized that the power to sell the Retirement CD was not merely an "incidental" or "useful" aspect of the business of banking: "The product represents the very essence of banking which is embodied in a bank's express authority to accept deposits and enter into contracts, and authority to incur liabilities and fund its operations."[33]
 
 
 108
 The OCC noted that "the inherent relationship that the Retirement CD customer has with the [issuing national bank] is that of depositor or creditor." The OCC rejected the contention that the life-based payment structure of the CD made its issue any less sanctioned as an expressly authorized national bank activity: "The fact that the product is structured to provide for interest payments keyed in part to the expected life of the depositor does not change the intrinsic nature of the Retirement CD as an authorized bank product." The OCC did condition its approval of the CD, however, on full compliance with seventeen listed conditions, which were directed to ensuring the safety of the product, the soundness of the issuing bank, and the provision of complete, accurate information to would-be purchasers.[34]
 
 
 109
 In subsequent, detailed letters to senators on the Committee on Banking, Housing, and Urban Affairs, the Comptroller of the Currency stood by the position taken by his office regarding authorization of the Retirement CD as a bank product. The senators had apparently expressed concerns about the safety of the CD and its nature as a national bank product. In his August 18, 1994 letter to Senator Alfonse D'Amato, the Comptroller of the Currency, Eugene A. Lewis, emphasized that his office had been fully informed of and fully understood the structure of the Retirement CD. He reiterated the earlier legal conclusion issued by his office that national banks were expressly authorized under federal law to issue the CD. He also explained that the OCC did not issue a "formal approval" of the product, and that none was needed for its sale, "[b]ecause offering the Retirement CD lies within the business of banking." Thus the Comptroller himself rejected the argument (asserted by the appellee in this case) that the issuance of the "no objection" letter, rather than a "formal approval" letter, somehow indicated that the Comptroller had reservations about the CD.
 
 
 110
 In his letter to D'Amato, the Comptroller addressed concerns that had been expressed about consumer protection, regulatory issues, safety and soundness, and competitive equality with insurance companies. The Comptroller explained the consumer protection and disclosure provisions upon which issuance of the Retirement CD was conditioned. He expressed confidence about the OCC's ability to monitor the Retirement CD: "We believe the OCC has the expertise fully to examine and evaluate Bank practices to mitigate the risks associated with the Retirement CD." He concluded:
 
 
 111
 We believe these steps adequately and responsibly address the supervisory concerns you have expressed with the payment risks associated with the Retirement CD. As with any bank product, we will continue to review the Bank's implementation of these procedures and evaluate the Bank's effectiveness in dealing with the risks associated with the product. Should we determine at any point that the Bank is materially not in compliance with these requirements, we would direct it to cease offering the product until it took appropriate corrective actions.
 
 
 112
 In regard to the insurance company competitors who had expressed concerns that the CD would give national banks a "competitive advantage" over annuity products offered by insurance companies, the Comptroller appropriately responded that "the potential for competitive implications does not affect the Bank's legal authority to offer the product." In addition, the Comptroller properly abstained from commenting on the potential applicability of state insurance laws to the Retirement CD,[35] since any such application would likely vary from state to state and was beyond his expertise and authority to determine.
 
 
 113
 The Comptroller's October 11, 1994 letter to Senator Donald Riegle, Chairman of the Committee on Banking, Housing, and Urban Affairs, addressed many of the same issues covered in the letter to Senator D'Amato, as well as some additional points raised in a letter received from Senator Riegle. The Comptroller again expressed confidence in the OCC's ability to monitor the offering of the Retirement CD and its commitment to ensuring that disclosures to potential customers were clear, simple, and complete. In addition, the Comptroller stated that Blackfeet National Bank had not commenced offering the CD, since it had not yet complied with all seventeen conditions imposed by the OCC in its no objection letter.
 
 
 114
 There can be little doubt that the Comptroller of the Currency has authorized offering of the Retirement CD by national banks. In so doing, he has defined terms in the National Bank Act, such as the "taking of deposits," to include the sale of this product; and he has emphasized that national banks have the power to offer the Retirement CD as part of their express powers under the National Bank Act. No one has provided this court with any reason, and I do not myself know of one, to conclude that the Comptroller's conclusion is not a "reasonable construction" of the National Bank Act. Because the Comptroller's interpretation of the National Bank Act, regarding authorization of the Retirement CD as a national bank product, involves the definition of terms within the Act and is reasonable in light of the revealed design of the Act, it is entitled to controlling weight. Thus it cannot be seriously questioned that national banks selling the Retirement CD are engaged in a banking activity. While I believe that we should not reach this issue--since I think we should reject Illinois's attempt to regulate the sale of the Retirement CD outright--if we resolve the case as the majority does, we cannot avoid the resulting conflict between federal banking law and state insurance law. I do not think we can authorize Illinois to regulate (and potentially forbid) the sale of the Retirement CD by national banks in its territory without confronting the federalism and national supremacy issues that are raised by such regulation. Neither the majority nor the appellee has provided legal authority for the proposition that a state can regulate as "the business of insurance" an activity by a national bank that the Comptroller of the Currency has specifically found to be "the business of banking." If we are ultimately to condone such a direct state intrusion into the authorized activities of a national bank, we should do so only after explicitly addressing the legal quandary at stake. The majority's conclusion that a national bank issuing an annuity is engaged in "the business of insurance" is only half the battle.
 
 
 115
 After considering the full import of the Supreme Court's unanimous decision in NationsBank, 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), I simply cannot accept the majority's conclusion that the selling of an annuity by a national bank constitutes "the business of insurance" under McCarran-Ferguson. While the NationsBank opinion did not address the precise question before us, its analysis, its tone, and the sources relied upon all compel the inference that annuities are not truly "insurance," and thus that a national bank selling them is not engaged in "the business of insurance." The modern literature on insurance powerfully affirms this conclusion, and the history of insurance caselaw is in accord. In addition, the long and established tradition against allowing state intrusion into the affairs of national banks cautions against too readily condoning the present regulation by the State of Illinois. If we are going to sanction the current state intrusion into national bank activities--activities specifically approved by the Comptroller of the Currency as being "the business of banking"--we should do so only after substantial hesitation and explicit consideration.
 
 
 
 [1]
 The Insurance Code does allow a national bank located in a town of 5000 or less people--such as Blackfeet--to register with the director in order to transact insurance business in Illinois as an insurance agent, but does not allow such a bank to act as an underwriter of the policies. 215 ILCS 5/499.1(a) & (e)
 
 
 [2]
 In support of their claim that the Bank Act authorizes the sale of the Retirement CD, plaintiffs offer a letter from the Office of the Comptroller of the Currency ("OCC"), advising Blackfeet that the OCC "had no objection if [Blackfeet] proceeds with its plans to market and offer the Retirement CD." [Def. App. p. 33]. Importantly, however, the OCC specifically noted that "state regulatory officials may conclude that state insurance laws apply to the Retirement CD." [Doc. 36, Ex. 8, p. 2]. Moreover, in a letter responding to concern expressed by John D. Dingell, Chairman of the United States House of Representatives Committee on Energy and Commerce, over whether national banks underwriting the Retirement CD would be required to comply with state insurance laws, the OCC wrote:
 In concluding that the Retirement CD represents a bank authorized product, we did not need to address the question of whether the bank is authorized to sell or underwrite annuities, or whether annuities are insurance products.... State regulatory officials may conclude that the state insurance laws also apply to the Retirement CD or any other activity which we interpret as being authorized by the National Bank Act. Such a conclusion however, does not affect our interpretation of the Act. A state's insurance laws and the National Bank Act are different laws with different purposes behind them. [App. 200] (emphasis added).
 
 
 [3]
 By deferring to the Comptroller's view that the brokering of annuities was an incidental banking power, the Court never reached the question of whether Section 92, by negative implication, precludes national banks located in places more populous than 5000 from brokering insurance--the argument made by the Respondent in NationsBank
 
 
 [4]
 Plaintiffs cite numerous cases and treatises which have distinguished insurance and annuities. See, e.g., Helvering v. Le Gierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 ("[A]nnuities and insurance are opposites; in combination the one neutralizes the risk customarily inherent in the other ... insurance looks to longevity, annuity to transiency."); 3 C.J.S. Annuities § 3c ("An annuity contract is distinguished from an insurance contract in that insurance ... is an agreement to ... pay a specified sum on the death of the insured or his reaching a certain age, while an annuity is ... an agreement to pay a specified sum to the annuitant annually during life."); 43 Am.Jur.2d Insurance § 5 ("[A] company engaged merely in selling annuities does not conduct an insurance business."). Defendant and Amici, on the other hand, provide an equally lengthy list of treatises and cases stating that annuities are insurance. See, e.g., New York Life Ins. Co. v. Sullivan, 89 N.H. 21, 192 A. 297 (1937) (holding that annuities are insurance); Mutual Ben. Life Ins. Co. v. Commonwealth, 227 Mass. 63, 116 N.E. 469 (1917) (same); A. Fingland Jack, An Introduction to the History of Life Assurance 165 (New York, E.P. Dutton & Co. 1912) ("As it exists in the present day ... the [annuity] contract is certainly life insurance."); Solomon S. Huebner, Life Insurance 47, 58 (1915) (classifying annuities as a "leading group of life insurance"). The most we can conclude from these long lists of cases and treatises is that annuities are not exactly insurance policies, but that the two have multiple similarities. Thus courts and treatise writers have stated that the two products are different in some situations, and the same in others. Unfortunately, none of the cases or treatises authoritatively answers the question that we must decide: Whether annuities are properly considered "insurance" for the purposes of the McCarran-Ferguson Act and state regulation
 
 
 [5]
 See, e.g., 215 ILCS 5/1124-5/125.24a (regulation of company's investment); 215 ILCS 5/244 (limitations on company's expenses); 215 ILCS 5/244.1 (Commissioner action for financial conditions hazardous to policyholders)
 
 
 [6]
 Plaintiffs contend that this reference is to "annuity insurance," which they claim is different from a typical annuity. In support of their claim they note that "annuity insurance" is defined in Black's Law Dictionary (6th ed. 1990) under "insurance" as "[a]n insurance contract calling for periodic payments to the insured or annuitant for a stated period or for life." Plaintiffs interpret this definition to include only situations where the beneficiary of a life insurance policy chooses to accept the proceeds of the policy in periodic payments as opposed to a lump sum. We do not believe the definition is as limited as plaintiffs suggest, especially given that an identical definition is provided for "annuity policy," which is defined under "annuity." Black's Law Dictionary (6th ed. 1990) ("an insurance policy providing for monthly or periodic payments to insured to begin at a fixed date and continue through insured's life.") (emphasis added). If anything, these definitional references run counter to plaintiffs' position by demonstrating that annuities and insurance are frequently viewed as the same product
 
 
 [1]
 I fully agree with the majority's conclusion that the provisions of the National Bank Act relevant to this case do not "specifically relate[ ] to the business of insurance" under section 1012(b) of McCarran-Ferguson. In other words, this case is unlike Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996), where the Supreme Court addressed a section of the National Bank Act, 12 U.S.C. § 92, which specifically authorizes national banks to sell insurance in towns with populations no greater than 5000 people. Not surprisingly, the Court held that this portion of the National Bank Act did "specifically relate[ ] to the business of insurance." Id. at ----, 116 S.Ct. at 1106. Thus that section "falls within the scope of [ ] McCarran-Ferguson's 'specifically relates' exception to its anti-preemption rule." Id. at ---- - ----, 116 S.Ct. at 1112-13 (emphasis added). Consequently, that federal insurance provision preempts state law to the contrary. Id. at ----, 116 S.Ct. at 1111. Our case involves neither a federal insurance provision nor an exception to the general principles of McCarran-Ferguson; it involves defining what "the business of insurance" means and what activities it includes
 
 
 [2]
 There may still be, however, a supremacy issue. See infra section IV
 
 
 [3]
 It should be noted that if this state regulation is not legitimately classified as "insurance business" under 215 ILCS 5/121 (forbidding transaction of "insurance business" in Illinois by companies not possessing an Illinois certificate of authority), the Illinois Insurance Code does not apply anyway. Other states have held, in various contexts, that annuities are not insurance and should not be treated as such. See, e.g., New York State Ass'n of Life Underwriters v. New York State Banking Dep't, 83 N.Y.2d 353, 610 N.Y.S.2d 470, 475, 632 N.E.2d 876, 881 (1994) (holding that state banks are authorized to sell annuities because "the great weight of authority supports the position that annuities are not insurance"); Cruthers v. Neeld, 14 N.J. 497, 103 A.2d 153 (1954) (holding that refund annuity contracts are not life insurance policies for purposes of inheritance tax); Corporation Comm'n v. Equitable Life Assurance Soc'y, 73 Ariz. 171, 239 P.2d 360, 362 (1951) (holding that proceeds from annuity sales not subject to state insurance premiums tax because "annuities are not indemnities for death but are investments for life"). The appellee has not provided specific authority (such as a holding by an Illinois court) for the claim that Illinois completely prohibits the selling of annuity products by entities other than insurance companies. Yet it is certainly possible that "insurance business" under the Illinois Insurance Code covers a broader range of activity than "the business of insurance" under the federal statute, section 1012 of McCarran-Ferguson, and includes all selling of annuities by state entities. Because I would conclude that Illinois cannot regulate the selling of the Retirement CD by national banks, however, I do not believe this case forces us to determine the scope of "insurance business" under Illinois law. Thus I would leave open the possibility that Illinois could forbid the selling of annuities by state banks, by defining this activity as "insurance business," though I maintain that it has no power to forbid their issuance by national banks, since the National Bank Act apparently allows the practice, see infra section IV, and it is not preempted by McCarran-Ferguson. Cf. Barnett Bank, 517 U.S. at ----, 116 S.Ct. at 1111 (noting that 12 U.S.C. § 92 "grant[s] small town national banks authority to sell insurance, whether or not a State grants its own state banks ... similar approval")
 
 
 [4]
 Exception must be taken to the suggestion in Judge Wood's concurring opinion that this dissent "makes a number of compelling policy arguments," supra at 844, since the opinion advances no policy arguments. The conclusion of this dissent, that Illinois cannot regulate a national bank's selling of the Retirement CD, is based upon Supreme Court precedent in the insurance realm, general insurance treatises, and dictionary evidence--all in an attempt to clarify the meaning of the terms "insurance" and "the business of insurance." While it may well be true that certain policy arguments support my position and that the proposed result "would be beneficial to competition as a whole," id., the opinion does not invoke such arguments
 
 
 [5]
 Although the majority does not actually address this issue, I believe that we must consider the supremacy implications of allowing a state agency to regulate a national bank if we are going to resolve this case as the majority does. See infra section IV
 
 
 [6]
 The Court defined "annuities" as follows: "Annuities are contracts under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary." NationsBank, 513 U.S. at ----, 115 S.Ct. at 812
 
 
 [7]
 See supra note 3 (noting some of the state cases concluding that annuities are not "insurance")
 
 
 [8]
 The Supreme Court has recently reminded us of the importance of looking to "ordinary English" when interpreting terms within the McCarran-Ferguson Act. Barnett Bank, 517 U.S. at ----, 116 S.Ct. at 1111 (referring three times to "ordinary English")
 
 
 [9]
 The Couch analysis would leave open the possibility, also noted supra at note 3, that a state could define annuities as "insurance" under its own insurance code and thus proscribe their sale by non-insurance company state entities (like state banks)
 
 
 [10]
 Even variable annuities, under which the amount of payments can vary according to the investment success of the issuer, involve an agreed-upon formula for calculating the payments to be made. VALIC, 359 U.S. 65, 69-72, 79 S.Ct. 618, 620-21, 3 L.Ed.2d 640 (1959)
 
 
 [11]
 Even the broadest definition of "insurance" proposed by C.J.S. would not encompass annuities. According to this broader definition, insurance "denotes a contract by which one party, for a compensation called the 'premium,' assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency." 44 C.J.S. Insurance § 2(a) (1993). Annuities, however, do not involve "premiums," nor do they involve a payment of money at the occurrence of a specified contingency. At best, annuities involve fixed payments until a specified contingency; but this does not fall within even the broad definition of "insurance."
 
 
 [12]
 The Black's Law Dictionary definitions of "annuity insurance" and "annuity policy," noted by the majority supra at p. 847, n. 6, might initially seem to undermine the conclusion that an annuity is not properly characterized as "insurance." For while the general definitions of "annuity" and "insurance" in Black's would make these terms mutually exclusive, the reference to the term "annuity insurance" under the main definition of "insurance" and the separate definition of "annuity policy" do seem to contemplate an overlap between insurance and annuities. The definition given by Black's for "annuity policy" is as follows: "An insurance policy providing for monthly or periodic payments to insured to begin at fixed date and continue through insured's life. Hamilton v. Penn Mut. Life Ins. Co., 196 Miss. 345, 354, 17 So.2d 278, 280 (1944)." BLACK'S LAW DICTIONARY 90 (6th ed. 1990). (Actually, the holding in Hamilton was that annuities are most certainly not life insurance; the court simply found that because insurance companies are authorized to issue the policies, they were subject to state insurance laws regulating the business of life insurance. 17 So.2d at 279-80.) And the Black's definition provided for "annuity insurance," which appears in a list of nearly 100 types of insurance located within the main definition of "insurance," is nearly equivalent: "An insurance contract calling for periodic payments to the insured or annuitant for a stated period or for life." BLACK'S LAW at 802. Based on Black's more general definitions of "annuity" and "insurance," however, it appears that the defining of these terms simply results from the fact that insurance companies have long been associated with selling annuities, which they have sometimes termed "annuity insurance" or "annuity policies"--"policy" being a word specifically associated with the insurance industry and used to refer to the written insurance contract, as Black's notes in its main definition of "insurance." Id. Thus I interpret Black's recognition and definition of the terms "annuity insurance" and "annuity policy," which are basically oxymorons under my analysis, simply to reflect acknowledgement of the loose way in which these terms have sometimes been used (particularly within the insurance industry), rather than an indication that annuities can reasonably be classified as a type of insurance. Among the insurance treatises I reviewed, all of which contained long lists of the myriad different types of insurance available, I did not find one reference to "annuity insurance." In my view, the term is simply a misnomer for annuity products that are sold by insurance companies
 
 
 [13]
 A "refund annuity" is one in which the "[a]nnuitant is assured a specified annual sum during his life, with the further assurance that in the event of his premature death there will be paid to his estate an additional amount which represents the difference between the purchase price and the amount paid out during annuitant's life." BLACK'S LAW DICTIONARY 90 (6th ed. 1990); see also 3A C.J.S. Annuities § 2 (1973)
 
 
 [14]
 In Le Gierse, 312 U.S. 531, 61 S.Ct. 646, the Court was considering whether the proceeds of a particular insurance policy, issued jointly with an annuity contract, were includable within the decedent's gross estate for federal estate tax purposes. Under the Revenue Act, money "receivable as insurance" by beneficiaries of the deceased, up to $40,000, could be excluded from the decedent's gross estate. The Le Gierse Court found that the annuity contract and the life insurance policy had to be considered together and that they "counteracted each other." Id. at 540-41, 61 S.Ct. at 649-50. The Court emphasized that the cumulative effect of the annuity contract and the insurance contract, which were issued by the same insurance company and would not have been issued separately, nullified the "insurance risk" that otherwise would have been part of the life insurance contract. Id. at 541, 61 S.Ct. at 650 ("[I]n this combination the one neutralizes the risk customarily inherent in the other."). The Court held that because the "insurance risk" of the life insurance policy was counteracted by the "investment risk" of the annuity policy, the proceeds from the insurance policy did not qualify for the estate tax "insurance" exemption. Id. at 542, 61 S.Ct. at 650 ("Any risk that the [annuity] prepayment would earn less than the amount paid to respondent as an annuity was an investment risk similar to the risk assumed by a bank; it was not an insurance risk...."). The Court viewed annuities and insurance as opposites: "From the company's viewpoint, insurance looks to longevity, annuity to transiency." Id. at 541, 61 S.Ct. at 650
 
 
 [15]
 The case involved an attempt by the Securities and Exchange Commission to require that variable annuities be registered as securities under the Securities Act of 1933. The respondent insurance companies maintained that McCarran-Ferguson applied, since several states and the District of Columbia regulated the annuities under their insurance codes. They also claimed that the annuities were exempt under the Securities Act itself, which exempts both annuities and insurance, see infra note 18, as well as the Investment Company Act. The Court simplified the question at issue to the element shared by all three statutes: "The question common to the exemption provisions of the Securities Act and the Investment Company Act and to § 2(b) of the McCarran-Ferguson Act is whether respondents are issuing contracts of insurance." VALIC, 359 U.S. at 68, 79 S.Ct. at 620 (emphasis added). Thus the Court considered only whether the variable annuities were "insurance," not whether they qualified under the Securities Act exemption for annuities
 
 
 [16]
 The Court described the alleged "mortality risk" as follows:
 Each issuer [of the variable annuities] assumes the risk of mortality from the moment the contract is issued. That risk is an actuarial prognostication that a certain number of annuitants will survive to specified ages. Even if a substantial number live beyond their predicted demise, the company issuing the annuity--whether it be fixed or variable--is obligated to make the annuity payments on the basis of the mortality prediction reflected in the contract. This is the mortality risk....
 VALIC, 359 U.S. at 70, 79 S.Ct. at 621.
 
 
 [17]
 Despite the Supreme Court's expressed intent not to provide a comprehensive definition of "insurance" in VALIC, the majority attempts to find in this decision a formula for "insurance," i.e., insurance = mortality risk + guaranteed return. See supra p. 841. In addition, the VALIC Court specifically rejected the claim that the "risk of declining returns in times of depression" qualified as the necessary "risk in the insurance sense." 359 U.S. at 71, 79 S.Ct. at 622. The Court noted, "We deal with a more conventional concept of risk-bearing when we speak of 'insurance.' " Id. Thus the majority's reference to a "decline in the market," see supra p. 841, as a "risk" that the Retirement CD protects against, cannot possibly qualify as an "insurance risk" that makes the CD "insurance." Furthermore, with the possible exception of the stock market crash of 1929, "a decline in the market" generally does not qualify as "a single, contingent event," as suggested by the majority. Id
 
 
 [18]
 The Supreme Court's recent decision in Barnett Bank, 517 U.S. 25, 116 S.Ct. 1103, is truly both an insurance case and a banking case, since it involves the power of national banks to sell insurance in small towns, despite state statutes to the contrary. See supra n. 1. Because the focus of the case is on the express authority granted by the National Bank Act--which fits within McCarran-Ferguson's exception to state law preemption--rather than on whether the national banks were selling "insurance" (they clearly were), I treat Barnett Bank in Section IV
 
 
 [19]
 McCarran-Ferguson exempts the business of insurance from federal antitrust law when that business is already regulated by state law:
 No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, ... the Sherman Act, ... the Clayton Act, and the ... Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
 15 U.S.C. § 1012(b).
 
 
 [20]
 The relevant section exempts the following from the Securities Act of 1933: "Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia." 15 U.S.C. § 77c(a)(8). The fact that the Securities Act exempts annuities and insurance separately exemplifies a Congressional recognition of their distinct nature
 
 
 [21]
 The Seventh Circuit cases are in accord. In N.A.A.C.P. v. American Family Mut. Ins. Co., 978 F.2d 287 (1992), we considered application of the federal Fair Housing Act to the insurance industry practice of "redlining"--charging higher rates or declining to write insurance for people who live in particular geographic areas. We held that even though the FHA did not "specifically relate[ ] to the business of insurance," so as to avoid McCarran-Ferguson preemption by state law (i.e., reverse preemption), the FHA did not in any way conflict with or displace a state insurance law. Thus we allowed the practice of redlining to be challenged under the FHA. We noted, however, that "[i]f Wisconsin wants to authorize redlining, it need only say so; if it does, any challenge to that practice under the auspices of the Fair Housing Act becomes untenable." Id. at 297. Our decision in Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561 (7th Cir.1991), fits more easily into the categories noted in the text, specifically category three. We held that the "Flexible Annuity" at issue did qualify as an annuity, such that it was exempt from the registration requirements of the Securities Act. Although we mentioned in dicta that "[a]nnuities sometimes contain an element of insurance" (since the longer the purchaser lives, the more the seller has to pay), id. at 565, we did not equate annuities and life insurance. And since the Securities Act provides separate exemptions for annuities and insurance, we did not have any reason to consider whether the annuity at issue could fairly be called "insurance."
 
 
 [22]
 The majority rightly notes that the Fabe Court recognized that this test developed in two cases where the issue at stake was whether the antitrust exemption of McCarran-Ferguson applied. The Fabe Court intimated that the category of "laws enacted for the purpose of regulating the business of insurance" (the first clause of § 1012(b), and the one at stake in Fabe) "necessarily encompasses more than just 'the business of insurance' " (the second clause of § 1012(b), and the one at stake in Royal Drug and Pireno). 508 U.S. at 504, 113 S.Ct. at 2210. Any such distinction in scope between the two clauses would not affect this case, however, since there is no question that the Illinois Insurance Code is a law enacted for the purpose of regulating the business of insurance. The only question here is whether Illinois is allowed to apply its insurance code to national banks by calling their offering of an annuity product "the business of insurance."
 
 
 [23]
 If the import of the third criterion is to ask the empirical question of whether the practice at issue has been limited to entities within the insurance industry, rather than the regulatory question of whether the practice has been legally restricted to only the insurance industry, the answer for annuities is that other entities have historically issued them, particularly charitable organizations and nonprofit institutions
 
 
 [24]
 The National Securities Court also recognized the danger of attempting to rely on the legislative history of McCarran-Ferguson to unravel the significance of the phrase "the business of insurance." The Court noted that "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies." 393 U.S. at 458-59, 89 S.Ct. at 568. The Court concluded, "The debates centered on these issues, and the Committee reports shed little light on the meaning of the words 'business of insurance.' " Id. at 459, 89 S.Ct. at 568. The report referred to by the majority, see supra p. 842, is consistent with the Supreme Court's observation, as it sheds little light on the critical issue. In fact, the entire legislative history contains not a single reference to "annuities" by any member of Congress or any witness during the debates and testimony which resulted in the Act
 
 
 [25]
 In the only case to raise the issue, the state insurance law was found to be preempted by a specific provision in the National Bank Act--a provision fitting within McCarran-Ferguson's express exception to state control of "the business of insurance," where a federal statute "specifically relates" to that business. See Barnett Bank, 517 U.S. 25, 116 S.Ct. 1103 (discussed infra). Thus there was no true conflict between McCarran-Ferguson's grant of limited insurance sovereignty to the states and the power granted national banks to sell insurance in small towns
 
 
 [26]
 See, e.g., M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 435-37, 4 L.Ed. 579 (1819) (rejecting state power to tax national bank and focussing on national banks as instruments of supreme national government that states have no power to "retard, impede, burden, or in any manner control"); Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 860, 6 L.Ed. 204 (1824) (reaffirming principles of M'Culloch and noting that national banks are "created for public and national purposes")
 
 
 [27]
 As explained infra, there is little doubt that the issuing of the Retirement CD falls within the express powers of national banks (since the Comptroller of the Currency says that it does and the conclusion is a reasonable one); nor is there any doubt that Illinois intends to significantly interfere with this activity, since it wants to forbid it entirely
 
 
 [28]
 Even the appellee does not contend that Congress expressly conditioned exercise of the National Bank Act powers to accept deposits, enter into contracts, incur liabilities, and fund bank operations--i.e., the powers under which the Retirement CD has been authorized by the Comptroller of the Currency, see infra--upon compliance with additional state regulation
 
 
 [29]
 I fully agree with the majority that this provision of McCarran-Ferguson was designed "to protect state [insurance] regulation primarily against inadvertent federal intrusion." Supra p. ---- (quoting Barnett Bank, 517 U.S. at ----, 116 S.Ct. at 1112 (emphasis in original)). The history of McCarran-Ferguson clearly indicates that Congress passed the Act in order to protect state control of the insurance industry against unintentional interference by broad federal statutes, particularly the antitrust laws. See Barnett Bank, 517 U.S. at ----, 116 S.Ct. at 1112 (reviewing history). The National Bank Act, however, is not such a statute; and my analysis does not by any means suggest "applying" it to the insurance industry. The majority's suggestion, supra p. 843, that protecting national banks who want to sell the Retirement CD from state law prohibition of this activity is "exactly the intrusion" that the Barnett Bank Court warned against, does not accurately reflect either the history of McCarran-Ferguson or the nature of our inquiry in the case at hand. This case is about state intrusion into federal banking business, not about federal intrusion into state control of the insurance business
 
 
 [30]
 The majority portrays my position as being "that the activities of national banks are simply not subject to state interference, regardless of the McCarran-Ferguson Act." Supra p. 843. I maintain no such thing. For example, I have no doubt that, were it not for Section 92, the states could forbid national banks to sell insurance in small towns or that the states can now forbid national banks to sell (pure) insurance in towns over 5000 people. Where a national bank is clearly engaged in non-banking, insurance activities, which are not specifically authorized by Congress, McCarran-Ferguson does seem to allow state regulation, even to the point of prohibition. The difficulty of this case is that Illinois wants to regulate as insurance what the Comptroller of the Currency has found to be banking. See infra
 
 
 [31]
 While the issue of national bank supremacy seems to arise rather infrequently in this circuit, we have previously recognized the import of the issue. In American Sur. Co. of New York v. Baldwin, 90 F.2d 708 (7th Cir.1937), we stated as follows:
 National banks are instrumentalities of the federal government created for a public purpose, and, as such, necessarily, subject to the paramount authority of the United States. Any attempt by a state to define their duties or to control the conduct of their affairs is void if it conflicts with the laws of the national government and either frustrates the purpose of the federal legislation, or impairs the efficiency of these agencies of the government to discharge the duties for the performance of which they are created.
 Id. at 709. Such a conclusion of law does not wither and die simply because it has not been relied upon for a long span of years--at least not without explanation of the cause and circumstances of its demise.
 
 
 [32]
 Subsequently, the Federal Deposit Insurance Corporation (FDIC) has also concluded that the Retirement CD is a "deposit" under the terms of the Federal Deposit Insurance Act, 12 U.S.C. § 1813(l ). The FDIC termed the Retirement CD a "hybrid CD," which would be insured by the FDIC like other bank deposits, up to a maximum of $100,000. The only special limitation on FDIC coverage is that annuity payments exceeding the value of the Retirement CD at the maturity date would not be federally insured, i.e., if the issuing bank failed while the holder of the Retirement CD was still living, but after the total of the annuity disbursements exceeded the account balance as of the maturity date, the FDIC would not continue making the annuity payments. The FDIC insisted that banks issuing the Retirement CD make this restriction clear to potential purchasers, and the OCC has asserted that it will monitor compliance with this requirement
 
 
 [33]
 The OCC also stated:
 The Retirement CD is clearly a financial product whose primary attributes are grounded in the Bank's expressly authorized powers. While somewhat novel in its approach to determining the interest on deposited funds by providing customers, inter alia, with a fixed periodic lifetime payment, the Retirement CD nonetheless represents fundamentally a bank authorized product.
 
 
 [34]
 For example, the OCC insisted that any issuing national bank take steps to protect itself against the risk of having to make lifetime annuity payments surpassing the value of the invested capital and accrued interest (when a purchaser lives longer than expected). Any issuing bank was required to develop a detailed plan for mitigating this risk, possibly through the purchase of commercially available annuities. Other conditions were designed to address matters such as the financial stability of the issuing banks, accurate accounting, and implementation of adequate product control systems. In addition, the OCC required that an opinion on the FDIC insured status of the CD be obtained and that potential customers be accurately informed of the meaning and significance of the FDIC's determination. The OCC also addressed specific language within the Retirement CD promotional materials, such as use of the term "guaranteed," to ensure that customers not be misled. Many additional conditions were directed to ensuring that potential purchasers are given clear, complete, and accurate information regarding the features and risks of the CD. The OCC even required that any issuing banks implement a special training program for all bank personnel who would be involved in the marketing of the CD, as well as a monitoring system to ensure compliance with the OCC conditions and other applicable laws and to handle customer complaints
 
 
 [35]
 He wrote:
 Our legal analysis and conclusions to date have been limited to a determination of the Bank's authority to conduct the business of banking under the National Bank Act. State regulatory officials may conclude that state insurance laws also apply to the Retirement CD or any other activity which we interpret as being authorized by the National Bank Act. Such a conclusion, however, does not affect our interpretation of that Act. The applicability of any particular state law to the Retirement CD will have to be reviewed on a case by case basis.
 The appellee's attempt to read into this statement some kind of concession by the Comptroller that state insurance laws will apply ignores the plain language of the statement. The Comptroller's position was simple: no comment.